[No. B075691. Second Dist., Div. Seven. Mar. 18, 1994.]

MORNINGSTAR, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
PILGRIM GROUP, INC., Real Party in Interest.

**COUNSEL**

Daniels, Baratta & Fine, Mary Hulett and Mark A. Vega for Petitioners.

No appearance for Respondent.

Christensen, White, Miller, Fink & Jacobs, Patricia L. Glaser, Nabil L. Abu-Assal and and Jonathan D. Varat for Real Party in Interest.

**OPINION**

**JOHNSON, J.**—Real party in interest brought an action against petitioners alleging libel and intentional interference with prospective economic advantage in connection with petitioners' publication in their biweekly financial newsletter of a commentary criticizing real party's advertisements in the Wall Street Journal. After the trial court overruled petitioners' demurrer, they petitioned this court for writ of mandate. We summarily denied the

petition. The California Supreme Court granted petitioners' petition for review, and we thus vacated our order denying mandate, issuing an alternative writ to be heard before this court. We now hold the complaint fails to state a cause of action and issue a writ of mandate.

## FACTS AND PROCEEDINGS BELOW

Petitioner Morningstar, Inc., is a financial research company providing research, data, and opinions about financial instruments. Its primary function is the collection, interpretation and publication of information about mutual funds. Morningstar publishes a biweekly financial newsletter, Morningstar Mutual Funds, which provides data and evaluations on more than 1,200 mutual funds.

Real Party in interest, Pilgrim Group, Inc. (Pilgrim), manages and sponsors mutual funds. Pilgrim claims in its complaint it was defamed by a commentary in the February 19, 1993 issue of Morningstar Mutual Funds written by Morningstar's publisher, petitioner Don Phillips. The commentary criticized two of Pilgrim's advertisements appearing in the January 28, 1993, and February 3, 1993, editions of the Wall Street Journal.

The advertisements reported the performance rankings of certain Pilgrim funds as compiled by Lipper Analytical Services, Inc. (Lipper), a leading service which tracks the performance of certain securities markets and products. The advertisement of January 28, 1993, is headed by a caption in bold type which reads, "The Pilgrim Group is proud to announce the final 1992 Mutual Fund Rankings as determined by Lipper Analytical Services." Under this heading appear five boxes, one beneath the other, each containing a ranking of a fund, as follows:

"# 1* The Pilgrim Group Adjustable Rate Securities Trust III

"# 2* The Pilgrim Group Adjustable Rate Securities Trust II

"# 3* The Pilgrim Group Adjustable Rate Securities Trust I

"# 4* The Pilgrim Group GNMA Fund

"# 5* The Pilgrim Group Pilgrim Regional BankShares"

Under the fifth box, the advertisement says, "To find out how this unprecedented performance can work for you please call 1-800-334-3444 Ext. 41 and ask for a brochure and prospectus. The Pilgrim Group." Then in tiny print at the very bottom of the column are these words: "*In its category. Rankings from Lipper Analytical Services, Inc., and cover one-year period ending 12/31/92. Brochure and prospectus provide more complete information regarding all charges, costs policies and fees. Read the prospectus carefully before you invest or send money. When redeemed, shares may be worth more or less that [sic] their original cost."

The February 3, 1993, advertisement contains the same five boxes with the same text in each, but is captioned, "Has anything like this ever happened before?" in large, bold type. The fifth box is followed by the text, "According to Lipper Analytical Services Inc., our family of ARM Funds swept the competition: numbers 1 through 5. That includes more than 50 mutual funds from some of the biggest names on Wall Street. To find out how this unprecedented performance can work for you please call 1-800-334-3444 Ext. 82. . . ." The rest of the language is the same as the first advertisement.

In each advertisement, the text in each box is in bold type. The largest type in the advertisement are the numbers # 1 to # 5. The asterisks following those numbers are disproportionately small when compared, for example, to how the size of an asterisk relates to the size of a character on a typewriter.

Petitioners' commentary about these advertisements appeared on the front page of the Morningstar Mutual Funds newsletter. That page contains the name of the newsletter across the top, a narrow column down the right edge containing a table of contents, and the column itself. The column is preceded by italicized text stating, "Pilgrim dominates the charts?" Then the title of the article in bold type reads, "Lies, Damn Lies, and Fund Advertisements." About half way down the page, the article is interrupted by the logo of the face and hat of a court jester with the words in bold type "Commentary" above it, and "by Don Phillips Publisher" below it.

The article reads as follows:

"Mutual fund advertising has hit a new low. A recent ad in *The Wall Street Journal* bears the bold caption: 'The Pilgrim Group is proud to announce the final 1992 Mutual Fund Rankings.' It is followed by tombstone-like award plaques with the following inscriptions: [quotes the five boxes]. Investors are urged to 'find out more about how this unprecedented performance can work for you.'

"A casual—or even a reasonably studied—reading of this ad suggests that Pilgrim dominated the fund charts this past year, managing the five top-performing funds in an 'unprecedented' display of managerial acumen. Nothing could be further from the truth. Pilgrim did not manage the top five funds in 1992. Indeed, none of Pilgrim's open-end mutual funds even placed in the top 100 of all funds. In a year when more than 500 funds turned in double-digit gains, only one of Pilgrim's open-end funds did so. Indeed, if Pilgrim is remembered for anything in 1992, it will likely be for the unprecedentedly bad performance of its two short-term world income funds, which plunged 9.8% and 15.1% despite category pledges of low risk. That Pilgrim could twist its often-poor performance record to create marketing material that makes it look like the industry's most-successful manager presents an important lesson in the use and abuse of statistics in the fund industry today.

"A Category for Everyone

"The ad's layout suggests that the # 1 through # 5 rankings are related to one another—that Pilgrim holds the top five slots in some uniform ranking. This is not the case. The ad's small print reveals that the rankings are independent of one another, each determined by a fund's showing in its own category. That Pilgrim scored a 1, 2, or 3 here, a 4 there, and a 5 somewhere else is simply a numerical curiosity, not evidence of managerial superiority. Moreover, the categories used to derive these rankings, or the number of funds included in each category, is not disclosed. In fact, it took a fair amount of creativity to produce the numbers 1 through 5.

"Let's start with the three adjustable-rate securities funds. Clearly, the 1-2-3 rankings are not based on comparisons among the entire universe of funds, as none of these three funds placed in the top 500. Nor do these funds show up in the list of the 100 top-performing bond funds. Even if one focuses solely on mortgage funds, these three Pilgrim funds still don't qualify for top honors. Only by further restricting the list to adjustable-rate funds is it possible for them to lead a list.

"That Pilgrim held the three top slots in this restricted universe is made substantially less impressive when one realizes that these aren't really three distinct portfolios, but rather represent a so-called hub-and-spoke fund that offers one portfolio with three different sales-charge structures. Therefore, what appears to be category dominance is really just triple counting of one portfolio's short-term success. What's unprecedented here may not be so much the portfolio's performance, but the multitude of fee structures that a firm may attach to a single portfolio.

"In restricting comparisons to adjustable-rate funds, Pilgrim doesn't really end up comparing its performance with those of similar funds. Unlike every other adjustable-rate fund, the three Pilgrim funds cited here do not focus on government issues. In essence, it's like comparing a corporate-bond fund with a government fund. Over most time periods, one would expect higher returns from the fund taking the greater credit risk—and that's exactly what happens here. All that these numbers demonstrate, then, is that almost any fund can become number one in its category simply by adding layers of qualification until the fund becomes an extreme example within a category.

"Gimme a Four! Gimme a Five!

"The number four ranking for the GNMA fund is also problematic. Again, the top fund is not among the top 500 of all funds, the top 100 of all bond funds, nor the top 30 of government funds. By Morningstar calculations, the fund placed seventh among all mortgage funds for the year. Perhaps, by dividing the mortgage group between funds that invest primarily in GNMAs and those that use other mortgages, it is possible to move the fund up to the fourth slot. Similarly, perhaps by employing asset-size screens that could, for example, consider only mortgage funds with less than $500 million in assets, it is possible to arrive at a number-four ranking. Indeed, with enough screens any fund can obtain just about any ranking its marketers desire. Because Pilgrim doesn't disclose the peer-group definition, investors have no way of knowing now the number-four ranking was derived. (By reading the fund's Morningstar review, however, investors would learn that the Pilgrim GNMA had never before placed among the top third of all mortgage funds in its seven calendar years of operation prior to 1992. They'd also note that the fund's assets had declined by more than 50% from their peak, suggesting considerable dissatisfaction from shareholders for the fund.)

"The number-five ranking assigned to Pilgrim Regional BankShares that rounds out the ad is even more troubling. Investors won't find this fund in the lists of top-performing open-end funds, because it's a closed-end fund—something not mentioned in the ad. Among all closed-end funds, it was the fifth-best performer in 1992, but this ranking tells far less than it might seem. There are only three closed-end funds that, like Pilgrim Regional BankShares, specialize in financial-services stocks. The other two funds enjoyed returns in excess of 70% this past year. Pilgrim's fund trailed those funds badly—as it also did most open-end funds for the year. Thus, while this fund looked good from a broad perspective, it was a dud among bank-stock funds. Its placing fifth out of all closed-end funds is simply a reflection of its sector's strength, and of that sector's limited representation among closed-end funds, which are heavily skewed toward international-stock and municipal-bond offerings.

"In theory, Pilgrim could have used this fund in its number-three slot, as it was the third-best (out of three) closed-end financial fund. That ranking, however, would have destroyed the ad's apparent continuity. Instead, Pilgrim carefully chose its performance rankings—taking statistics from very specialized categories in some cases and broad ones in others—in order to link performances ranked one through five.

"From Bad to Worse

"Stunningly, Pilgrim reran this ad a few days later with the same five rankings but an even brasher heading, 'Has anything like this ever happened before?' If the question asks whether any funds group has managed to obtain rankings from 1 through 5 in numerous, unrelated categories, the answer is, undoubtedly, Yes. In fact, not a period goes by where a group like Fidelity, with its many funds, couldn't construct such a claim. (Fidelity, to its credit, hasn't had the audacity to run an ad trumpeting such numerical coincidences.) If the question refers to Pilgrim's apparent dominance of the adjustable-rate category, the answer is both yes and no. Yes, other funds have taken greater risks than their peers and thus produced greater short-term profits, but No, prior to the advent of hub-and-spoke or multiple-class fund arrangements, funds would only have their performance ranked once, not two or three times as happens here. Hence, while in the past it was uncommon for a fund family to have several offerings on a leaders list in the future it may be quite common. Of course, this change owes only to the mechanics of the rankings, not to a concentration of talent.

"Perhaps the more useful way to interpret Pilgrim's query is simply to acknowledge that, No, no fund group before Pilgrim has taken such liberties with its performance rankings. If investors come to funds because they think they'll get a fair shake—that they can reliably sort out the winners from the losers—then this ad may shake their belief. As long as a fund group can take almost any performance and define it publicly as a great success, investors will be hard-pressed to make informed choices. While it is possible that this ad follows the letter of the law, it most certainly flouts the SEC's efforts to make fund advertising fairer. (This is especially true because the rankings, unlike Morningstar's ratings, ignore sales charges. Paradoxically, while Pilgrim could not quote the raw return on which the ranking is based without also giving a load-adjusted return, it is permitted to quote the ranking without any consideration of sales charges.)

"Conclusions

"It's ironic that such a misleading ad should be circulating just when the fund industry is appealing for the right to sell shares directly off the

page—without sending investors a prospectus first. If ads like Pilgrim's meet current standards for fund advertising, it is difficult to believe the industry's claim that funds can be responsibly distributed through direct-response advertising. Clearly, the data used in fund ads has the power to obscure as much as to inform. Unless the guidelines are tightened, the notion of informed analysis through fund advertisements borders on the absurd.

"The money-management business asks investors to place their dreams, their retirements, and their children's educations in its care. If the industry continues to play fast and loose with performance rankings, investors may rightly question whether fund companies have shareholders' best interests at heart. The fund industry must be held to a higher standard than that of other consumer-products industries if it wants to retain its position as the vehicle of choice for long-term financial planning. Sadly, the continued manipulation of fund rankings to flatter fund companies and potentially mislead investors suggests that some companies still fall short of the mark."

Pilgrim filed its complaint on March 18, 1993, alleging two causes of action, for libel and intentional interference with prospective economic advantage. The first cause of action for libel describes three categories of the commentary as giving rise to a claim of libel: the title of the commentary, the omission of any reference to Lipper as the source of the rankings, and comments which disparaged and questioned the validity of the rankings.

Petitioners demurred to both causes of action on two grounds: (1) Pilgrim cannot identify any "provably false factual assertions" in the commentary; and (2) the speech is protected opinion. Petitioners also moved to strike the punitive damages claim on the grounds Pilgrim's request for such damages was insufficiently pleaded. Both motions were heard May 11, 1993. The court overruled the demurrer. The minute order reads in pertinent part:

"Demurrer is overruled. The allegation in the complaint that defendant falsely accused plaintiff of lying in its advertising is actionable, just as the accusation in MILKOVITCH [sic] v. LORAIN JOURNAL CO. that the plaintiff lied in his testimony, was held by the U.S. Supreme Court to be actionable."

On June 3, 1993, petitioners filed a petition for peremptory writ of mandate directing the respondent court to set aside its order overruling petitioners' demurrer. This court summarily denied the petition on June 10, 1993. Petitioners timely petitioned the California Supreme Court for review and on August 17, 1993, the petition for review was granted and the high court ordered us to issue an alternative writ. Accordingly, this court vacated our order denying mandate on August 26, 1993, and issued an alternative writ to be heard before this court on December 2, 1993.

## DISCUSSION

■ When we consider the sufficiency of a complaint against a general demurrer, we accept as true "all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law," and we consider facts that may be judicially noticed. (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]; Code Civ. Proc., § 430.30.) Further, in cases raising First Amendment issues, as an appellate court, we have an obligation to make an independent examination of the whole record in order to ensure there is no infringement of free expression. (*Milkovich* v. *Lorain Journal Co.* (1990) 497 U.S. 1, 17 [111 L.Ed.2d 1, 17, 110 S.Ct. 2695, 2705].)

I. *The First Cause of Action for Libel Fails to State a Cause of Action Because There Is No Injurious Falsehood in the Commentary.*

■ Civil Code section 45 defines libel.[1]

Pilgrim alleges it was libeled in three ways. First, we will discuss Pilgrim's claim petitioners did not disclose Lipper as a source of the rankings; second, the title of petitioners' article falsely asserted Pilgrim's ads constituted "lies"; and, third, the article disparaged and questioned the validity of the rankings.

A. *Omission of Lipper as Source of Rankings.*

■ At the threshold, we observe that in defamation actions the statutory law has abrogated the common law of strict liability. (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 347 [41 L.Ed.2d 789, 809, 54 S.Ct. 2997].) For constitutional purposes it is not enough that traditional affirmative defense of truth, with the burden of proof on the defendant, be available to the press; rather it is the plaintiff who is required to plead and prove falsehood. (*Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033, 1042 [232 Cal.Rptr. 542, 728 P.2d 1177].)

The dispositive question for this court is whether a reasonable fact finder could conclude the published statements imply a provably false factual assertion. (*Moyer* v. *Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 724 [275 Cal.Rptr. 494], citing *Milkovich, supra.*) Whether

---

[1]"Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.)

the challenged statement is reasonably susceptible of an interpretation which implies a provably false assertion of actual fact is a question of law. (*Moyer, supra,* at p. 725, fn. 2; *Kahn* v. *Bower* (1991) 232 Cal.App.3d 1599, 1608 [284 Cal.Rptr. 244].)

 Pilgrim alleges in its complaint petitioners omitted any reference to Lipper as the source of the rankings, thereby implying Pilgrim itself created the rankings. The complaint does not allege in what manner this omission is defamatory. However, in its brief to this court, Pilgrim explains if the readers of the article had been fully and fairly apprised Lipper created the rankings, they may well have concluded Pilgrim had not published false and misleading advertisements and was not a liar in general.

Pilgrim cites *Masson* v. *New Yorker Magazine, Inc.* (1991) 501 U.S. 496 [115 L.Ed.2d 447, 111 S.Ct. 2419] and *Crane* v. *The Arizona Republic* (9th Cir. 1992) 972 F.2d 1511, 1523, for the proposition when an author materially alters the quoted words of a speaker in a defamatory manner, the author's alteration constitutes a factual basis for a libel cause of action not protected by the First Amendment.

It is true the commentary omits any mention of Lipper as the source of the rankings. However, first, we do not agree with Pilgrim the commentary leads the reader to believe Pilgrim formulated its own rankings. Even assuming it does, unless Pilgrim's premise is the rankings are false, we do not see how attributing the rankings to Lipper would change the effect of the article on its readers. "[T]he statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.' " (*Masson* v. *New Yorker Magazine, Inc., supra,* 501 U.S. at p. 517 [115 L.Ed.2d at p. 472, 111 S.Ct. at p. 2433].) Pilgrim must take responsibility for publishing Lipper's rankings regardless of their accuracy.

### B. *The Title of the Commentary.*

Pilgrim next alleges the title of petitioners' article, "Lies, Damn Lies, and Fund Advertisements," "constitutes a direct, false assertion that Pilgrim Group's Advertisements constituted 'lies' and 'damn lies,' when in fact every statement in such Advertisements was true." Petitioners reply the caption is a play on Mark Twain's famous quote, "lies, damn lies and statistics." "Twain wrote in his 1924 autobiography that the English politician and historian Benjamin Disraeli had once said there were three kinds of lies: 'lies, damned lies, and statistics.' "

Petitioners first point out they do not dispute the truth of Pilgrim's advertisements anywhere in the article. Instead the article takes issue with

Pilgrim's use of fine print and manipulation of categories to present the rankings in a manner most favorable to Pilgrim. Second, petitioners argue the title is a classic example of rhetorical hyperbole protected under First Amendment principles. They explain they altered this familiar phrase into a "lusty and imaginative expression" of their contempt for the misuse of statistics in mutual fund advertisements. (*Letter Carriers* v. *Austin* (1974) 418 U.S. 264, 284-286 [41 L.Ed.2d 745, 761-763, 94 S.Ct. 2770] [naming plaintiff in a "List of Scabs" in a union newsletter was not defamatory despite plaintiff's production of literature defining "scab" as "traitor" because the newsletter listing was not actually accusing plaintiff of committing the criminal offense of treason.].)

■ In determining whether statements are of a defamatory nature, and therefore actionable, " 'a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of the complaint for libelous publication according to its natural and popular construction.' That is to say, the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." (*Edwards* v. *Hall* (1991) 234 Cal.App.3d 886, 903, fn. 14 [285 Cal.Rptr. 810], citing *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 547 [343 P.2d 36].)

■ The average readers of this newsletter were the subscribers to the financial newsletter. (See *Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 261 [228 Cal.Rptr. 206, 721 P.2d 87] [focusing on the average reader of the questioned column].) Petitioners point out, "The imaginative title and its hint of upcoming criticism of statistics was not likely lost on the readers of petitioners' commentary—the relatively sophisticated subscribers to the financial newsletter." The front page of the commentary not only contains the headline of which Pilgrim complains, but also a bolded caption reading "Commentary by Don Phillips Publisher," and even a drawing of a court jester. We agree with petitioners, particularly in this context, the title conveyed the sense this was an article expressing an opinion about how statistics were manipulated, not that the statistics themselves were false.

Pilgrim relies heavily on the Supreme Court opinion in *Milkovich* v. *Lorain Journal Co.*, *supra*, 497 U.S. 1. Prior to *Milkovich*, it was believed that so long as speech was couched in terms of opinion, it was protected. According to the court in *Milkovich*, this belief grew out of dictum in *Gertz* v. *Robert Welch, Inc.*, *supra*, 418 U.S. 323 at pages 339-340 [41 L.Ed.2d at pages 804-806]: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its

correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." (Fn. omitted.)

In *Milkovich*, a high school wrestling coach had sued a newspaper and a reporter concerning an article under the headline, "Maple beat the law with the 'big lie,'" and the carryover page headline announced, ". . . Diadiun says Maple told a lie." (See *Milkovich* v. *Lorain Journal Co., supra*, 497 U.S. at p. 4 [111 L.Ed.2d at p. 8, 110 S.Ct. at p. 2698].) In the newspaper article, the reporter accused the coach of having lied at a judicial hearing.

Milkovich commenced a defamation action against the newspaper and reporter, alleging the column accused him of committing the crime of perjury, damaged him in his occupation of teacher and coach, and constituted libel per se. Ultimately, the trial court granted summary judgment for respondents. The Ohio Court of Appeals affirmed, holding as a matter of law the article was constitutionally protected opinion.

The Supreme Court held the First Amendment does not require a separate "opinion" privilege limiting the application of state defamation laws. The high court felt the breathing space freedom of expression requires to survive is adequately secured by other constitutional doctrines. (*Milkovich* v. *Lorain Journal Co., supra*, 497 U.S. at pp. 19-20 [111 L.Ed.2d at pp. 18-19].) Although contained in a sports column and couched in the language of opinion, the court found the statements in the column implied an assertion Milkovich perjured himself in a judicial proceeding. The article did not use the sort of loose, figurative, or hyperbolic language which would negate the impression Diadiun was seriously maintaining Milkovich committed perjury, nor did the article's general tenor negate this impression. (*Id.* at p. 21 [111 L.Ed.2d at p. 19].)

Nonetheless, the Supreme Court in *Milkovich* preserved the constitutional limits on the types of speech subject to state defamation actions. (*Milkovich* v. *Lorain Journal Co., supra*, 497 U.S. at pp. 15-17 [111 L.Ed.2d at pp. 15-17, 110 S.Ct. at pp. 2704-2705].) The court proposed a two-part test to assist courts in deciding whether a statement is opinion or fact: first, a statement on matters of public concern must be provable as false, and, second, it must reasonably be interpreted as stating actual facts about an individual.

In particular, *Milkovich* recognizes the survival of opinion cases decided on the grounds of hyperbole, rhetoric and criticism. (497 U.S. at pp. 15-17 [111 L.Ed.2d at pp. 15-17, 110 S.Ct. at pp. 2704-2705].) The court's

decision free speech was sufficiently protected without a special category for opinion was preceded by a discussion of types of speech that traditionally have been protected by the court and continue to be so protected.

The court stated, "We have also recognized constitutional limits on the *type* of speech which may be the subject of state defamation actions." (*Milkovich* v. *Lorain Journal Co., supra*, 497 U.S. at p. 16 [111 L.Ed.2d at p. 16].) Among those types of speech was "loose, figurative or hyperbolic language." The court went on to describe with approval three such cases, *Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537], where the court decided as a matter of constitutional law the word "blackmail" was not libel when reported in the News Review; *Hustler Magazine* v. *Falwell* (1988) 485 U.S. 46, 50 [99 L.Ed.2d 41, 48, 108 S.Ct. 876], precluding recovery for emotional distress for an ad parody describing Falwell as having engaged in a drunken incestuous rendezvous with his mother in an outhouse; and *Letter Carriers* v. *Austin, supra*, 418 U.S. 264, 284-286 [41 L.Ed.2d 745, 761-763], holding the use of the word "traitor" in a literary definition of a union "scab" was used "in a loose, figurative sense" and was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members."

The court thus recognized opinion in the form of "loose, figurative or hyperbolic" speech is already sufficiently protected under the Constitution by the *Bresler-Letter Carriers-Falwell* line of cases and needs no further protection. (*Milkovich* v. *Lorain Journal Co., supra*, 497 U.S. at p. 20 [111 L.Ed.2d at p. 19, 110 S.Ct. at p. 2706].) "[T]he *Bresler-Letter Carriers-Falwell* line of cases provides protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual. *Falwell*, 485 U.S. at 50 [99 L Ed 2d at p. 48]. This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation. See *id.*, at 53-55 [99 L Ed 2d at pp. 50-51]." (*Milkovich, supra*, 497 U.S. at p. 20 [111 L.Ed.2d at p. 19, 110 S.Ct. at p. 2706].)

In the instant case Pilgrim does not allege anything in the article is false other than the title. Nor does it claim the text of the article itself accuses Pilgrim of lying in its advertisements. We likewise conclude it does not appear the article accuses Pilgrim of lying. In fact, the author concedes "it is possible that this ad follows the letter of the law." Rather than accusing Pilgrim of lying in the ads, it appears to us the average reader would construe the article as accepting the truth of the figures in the advertisement. Further, we believe the title of the commentary is simply "imaginative expression" or "rhetorical hyperbole," traditionally protected under the First

Amendment, before and after *Milkovich*, and this flavor was not lost on its sophisticated readers.

Thus, we conclude the "loose, figurative or hyperbolic speech" in which petitioners engaged in this title was protected before *Milkovich* and remains protected in its wake.

There is ample support for this position in cases decided before and after *Milkovich*.

In *Aisenson* v. *American Broadcasting Co.* (1990) 220 Cal.App.3d 146 [269 Cal.Rptr. 379], a superior court judge sued a television station for making derogatory statements about the judge including calling him a "bad guy." After analyzing the term according to its dictionary meaning, the Court of Appeal held the term "could not reasonably be construed as an actionable false statement of fact. . . . At most, it was rhetorical hyperbole, and is therefore not actionable." (*Id.* at p. 157.)

The title "Lies, Damn Lies, and Fund Advertisements" alone cannot reasonably be read to imply a provably false factual assertion about Pilgrim, as it is clearly a play on words, borrowed from a recognizable quote, and an "imaginative expression." It does not directly accuse Pilgrim of lying, as did the caption in *Milkovich*. Apparently it was meant to be eye-catching and witty. In *Moyer* v. *Amador Valley J. Union High School Dist., supra,* 225 Cal.App.3d 720, 726, the headline of a student newspaper read "Students terrorize Moyer." The court stated ". . . even if the descriptive term 'terrorize' is an exaggeration. . . , it nonetheless falls within the protectible category of rhetorical hyperbole—a word used in a loose, figurative sense."[5]

Similarly, in *Hylsky* v. *Globe Democrat Pub. Co.* (1941) 348 Mo. 83, 89 [152 S.W.2d 119, 122], a police detective sued Globe Democrat Publishing

---

[5]James E. Stewart and Richard E. Rassel, in their article, *The First Amendment Protection of Opinion* (Oct. 1991) 70 Mich. B. J. 1031, compiled several cases in which the courts held as nonlibelous statements which were phrased in "vituperative" terms, or used language in a loose or figurative sense: "Consider, for example, *Buckley* v. *Littell*, 539 F.2d 882 (2d Cir. 1976) (references to columnist William F. Buckley as a 'fellow traveler of fascism'); *Hotchner* v. *Castillo-Puche*, 551 F.2d [910] (2d Cir. 1977) (plaintiff referred to as a 'hypocrite' and 'never open and above-board'); *Richardson* v. *Signal Publishing*, 5 Media Law Reporter (BNA) 1593 (Ohio App. 1979) (references to a township clerk as 'playing hide and seek' with township funds); *Anton* v. *St. Louis Suburban Newspapers*, 5 Media Law Reporter (BNA) 2601 (Mo. Ct. App. 1980) (references to the change of membership on a public board as a product of plaintiff's 'sleazy sleight of hand'); *Chaplin* v. *Amordian Press*, 14 Media Law Reporter (BNA) 1206 (N.Y. 1988) (references to a recording studio executive as 'an unbelievably unscrupulous character'); *Pease* v. *Telegraph Publishing*, 7 Media Law Reporter, 1114 (BNA) (N.H. 1981) (statements that a journalist had conducted the 'worst single example of a journalistic smear' and labeling the plaintiff journalist as 'journalistic scum of the earth'); *Myers* v. *Boston Magazine*, 6 Media Law Reporter (BNA) 1241 (Mass. 1980) (references to television sports announcer as 'worst sports announcer in Boston' and as

Company, claiming the headline of a news article was libelous, even though the article itself was true. The headline read, "Officer Working Alone Solves Case, Trapping Own Friend." Plaintiff, the officer mentioned in the headline, took issue with the work "trapping," arguing it made him appear to have used deception and subterfuge, and arguing it accused him of wicked, wrongful and contemptible conduct in arresting his friend, which inferences were untrue. The court held the article must be read and considered as a whole along with the headline, and when so read the conclusion and inferences alleged by plaintiff are unsupported by the terms of the article.

In the case before this court, the tenor of the commentary itself does not lend a defamatory meaning to the title. Pilgrim does not claim petitioners make false statements in the commentary when describing how Pilgrim presented its rankings. While the tenor of the article in this case is emphatically disapproving, disapproval does not necessarily amount to defamation especially where, as here, the article is not alleged to make false statements. Nowhere in the article do petitioners state or imply Pilgrim lied, in fact, the article points out the ads may "follow the letter of the law." The clear tenor of the article is summarized by one of its passages: "All that these numbers demonstrate, then, is that almost any fund can become number one in its category simply by adding layers of qualifications until the fund becomes an extreme example within a category."

Indeed, the commentary assumes the truth of the rankings themselves:

"Perhaps the most useful way to interpret Pilgrim's query ['Has anything like this ever happened before?'] is simply to acknowledge that, No, no fund group before Pilgrim has taken such liberties with its performance rankings."

"Pilgrim carefully chose its performance rankings—taking statistics from very specialized categories in some cases and broad ones in others—in order to link performances ranked one through five."

"Stunningly, Pilgrim reran this ad a few days later with the same five rankings but an even brasher heading, 'Has anything like this ever happened before?' If the question asks whether any fund group has managed to obtain rankings from 1 through 5 in numerous, unrelated categories, the answer is, undoubtedly, Yes."

█ The characterization of the article as a "Commentary" also is relevant in considering the context in which the article appears. "[C]olumns or

---

'enrolled in a course for remedial speaking'), and *Henderson* v. *Times Mirror Co.*, 14 Media Law Reporter (BNA) 1659 (D.C. Colo. 1987) (references to a professional sports agent as a 'sleazebag' who 'kind of slimed up from the bayou.')."

articles which appear in the opinion-editorial pages of newspapers, are 'the well-recognized home of opinion and comment.' " (*Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d 254, 267-268, citing *Ollman* v. *Evans* (D.C. Cir. 1984) 750 F.2d 970 [242 App.D.C. 301], cert. den. (1985) 471 U.S. 1127 [86 L.Ed.2d 278, 105 S.Ct. 2662].) "The reasonable reader who peruses [a] column on the editorial or Op-Ed page is fully aware that the statements found there are not 'hard' news like those printed on the front page or elsewhere in the news sections of the newspaper." (*Ollman, supra,* at p. 986.) Similarly, in *Janklow* v. *Newsweek* (8th Cir. 1986) 788 F.2d 1300, 1304, the court explicitly relied on the statement's location in a weekly magazine, holding magazines have a tradition of "colorful, even feisty language" that would signal the reader to expect a fair amount of opinion.

We do not think *Milkovich* compels a different result in this regard. We agree with the court in *Phantom Touring Inc.* v. *Affiliated Publications* (1st Cir. 1992) 953 F.2d 724, when it said, "Although the Court in *Milkovich* gave no significance to the fact that the challenged article was a sports column, we do not understand the Court to have rejected the relevance of format, but simply to have discounted it in the circumstances of that case. See 110 S.Ct. at p. 2707 (referring to the general tenor of the article)." (*Phantom Touring, supra,* at p. 729, fn. 9.) We think a "Commentary" is quite different from a sports column insofar as whether the reader expects facts or opinion. Here, where the article was labeled "Commentary," complete with a drawing of a smiling court jester, the reader is forewarned that what follows is one person's opinion.

Professor Smolla explains in Smolla, Law of Defamation (1991) section 6.12[4], at page 6-47, "The Op-Ed page is one of the great American forums for the free exchange of vitriolic debate, and readers can be expected to discount the statements made in that context as more likely to be the stuff of opinion than fact. . . . [I]t is clear that the editorial context is regarded by the courts as a powerful element in construing as opinion what might otherwise be deemed fact." (Fn. omitted.)

■ Before *Milkovich* and after, California courts have applied a "totality of the circumstances" test to review the meaning of the language in context and its susceptibility to being proved true or false. (*Moyer* v. *Amador Valley J. Union High School Dist., supra,* 225 Cal.App.3d at p. 724.) "Before *Milkovich,* the California courts had employed a 'totality of the circumstances' test to differentiate between fact and opinion. . . . [¶] *Milkovich* did not substantially change [this] principle[]; it underscored that in cases such as this, raising First Amendment issues, a reviewing court must make an independent examination of the whole record in order to ensure that there

is no infringement of free expression. [Citations.] The dispositive question for the court is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion. [Citation.] The answer to that question is determined by applying the 'totality of the circumstances' test—a review of the language in context and its susceptibility of being proved true or false." (*Id.* at pp. 724-725, fn. omitted.)

■ We do not believe the average reader of this financial newsletter would be led by the article, title, text and context included, to think anything other than Pilgrim manipulated the rankings. This Pilgrim does not deny. ■ "Merely making unflattering factual statements about someone, without more, does not give rise to a cause of action for defamation. . . . [T]here must be some proof not only that they tended to impute a lack of professional ability, but also that the objected-to statements were false; obviously, a true statement of fact is not defamatory. [Citations.]" (*Aisenson v. American Broadcasting Co., supra,* 220 Cal.App.3d 146, 155, italics omitted.) ■ Here the title and text of petitioner's commentary suggest Pilgrim manipulated statistics, not that they lied. There is no allegation this suggestion is false, nor could there be.

In conclusion, we conclude the title is no more than "loose, figurative, or hyperbolic language." (*Milkovich* v. *Lorain Journal Co., supra,* 497 U.S. at p. 21 [111 L.Ed.2d at p. 19, 110 S.Ct. at p. 2707].) There is no claim the text of the commentary is false yet "[t]he sine qua non of recovery for defamation . . . existence of a falsehood." (*Letter Carriers* v. *Austin, supra,* 418 U.S. at p. 283 [41 L.Ed.2d at p. 761], italics omitted.) Further, the title and text read together would lead the average reader of the newsletter to believe the article is opinion. These factors, together with the further consideration the article warns the reader it is a "Commentary," convince us this article is not defamatory.

C. *Disparagement and Questioning of the Validity of the Rankings.*

Next, Pilgrim alleges, "The Article disparaged and questioned the validity of the Rankings, by comparing those Rankings with rankings determined by Morningstar although Morningstar's rankings had no relevance whatsoever to the Advertisements, which reported rankings determined by Lipper. The following statements in the article, among others, contain this defect: In the case of Pilgrim Regional BankShares, which ranked fifth among all closed-end funds, the Article stated, 'Thus, while this fund looked good from a broad perspective, it was a dud among bank-stock funds.' Similarly, in attacking the ranking of Pilgrim's GNMA Fund, the Article stated, 'By Morningstar calculations, the fund placed seventh among all mortgage funds for the year.' "

Further, Pilgrim complains the article denigrated the performance of two of Pilgrim's funds that were not mentioned in the advertisements.

Again, Pilgrim fails to allege any of these statements were false. Therefore, without reaching other defects in these allegations, we hold they lack the requisite elements of a defamation claim. (*Letter Carriers* v. *Austin, supra,* 418 U.S. at p. 283 [41 L.Ed.2d at p. 761].)

The press plays an unparalleled, vital role in contributing to the public debate on matters of great importance, which lies at the heart of the First Amendment. (*Dun & Bradstreet, Inc.* v. *Greenmoss Builders* (1985) 472 U.S. 749 [86 L.Ed.2d 593, 105 S.Ct. 2939, 2944-2945].) *Milkovich* continues the guarantee of special protection to matters of public concern. (*Milkovich* v. *Lorain Journal Co., supra,* 497 U.S. at pp. 13-19 [111 L.Ed.2d at pp. 14-18, 110 S.Ct. at pp. 2703-2707].) The challenged article presents to the public the author's view of a matter of public concern: the impact on consumers who invest their money in reliance on advertisements such as Pilgrim's, especially in light of proposed Securities and Exchange Commission regulations concerning mutual fund advertising. (See the final two paragraphs of the commentary at pp. 684-685, *ante.*)

In the case at bar, petitioners' commentary was a timely expression of opinion on a matter of public concern, precisely the kind of speech which the First Amendment is designed to promote and protect. " ' "Whatever is added to the field of libel is taken from the field of free debate." ' " (*Milkovich* v. *Lorain Journal Co., supra,* 497 U.S. at p. 36 [111 L.Ed.2d at p. 29, 110 S.Ct. at p. 2715] (dis. opn. of Brennan, J.).) We are disinclined to restrain the press on a matter of public concern under the facts presented in this case, especially considering the words, context and tenor of the commentary and its contribution to a significant subject of public debate.

II. *The Second Cause of Action for Intentional Interference With Prospective Economic Advantage Fails to State a Cause of Action Because There Is No Injurious Falsehood in the Commentary.*

Pilgrim's second cause of action is for intentional interference with prospective economic advantage based on the same publication.

"The elements of the tort of intentional interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and some third person containing the probability of future economic benefit to the plaintiff; (2) knowledge by the defendant of the existence of the relationship; (3) intentional acts on the part of the defendant designed to

disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to the plaintiff proximately caused by the acts of the defendant. [Citation.]" (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 330 [216 Cal.Rptr. 718, 703 P.2d 58].)

However, because Pilgrim's intentional interference claim has as its gravamen the alleged injurious falsehood of a statement, First Amendment doctrines apply. (*Blatty* v. *New York Times Co.*, *supra*, 42 Cal.3d 1033, 1045, cert. den. (1988) 485 U.S. 934 [99 L.Ed.2d 268, 108 S.Ct. 1107]; *Paradise Hills Associates* v. *Procel* (1991) 235 Cal.App.3d 1528, 1542 [1 Cal.Rptr.2d 514].)

In *Paradise Hills*, a developer, Paradise Hills Associates, sued a purchaser of one of its houses for interference with prospective economic advantage, after the purchaser publicly criticized the quality of the developer's products and services, and made public statements about her unhappiness with them. She also allegedly attempted to persuade prospective customers not to purchase homes in Paradise Hills. The court held her speech was protected under the First Amendment. "Courts have recognized the importance of the public's access to consumer information. 'The growth of "consumerism" in the United States is a matter of common knowledge. Members of the public have recognized their roles as consumers and through concerted activities, both private and public, have attempted to improve their relative positions vis-à-vis the supplies [*sic*] and manufacturers of consumer goods. They clearly have an interest in matters which affect their roles as consumers, and peaceful activities, such as plaintiffs', which inform them about such matters are protected by the First Amendment." (*Paradise Hills Associates* v. *Procel*, *supra*, 235 Cal.App.3d at p. 1544, citing *Concerned Consumers League* v. *O'Neill* (E.D.Wis., 1974) 371 F.Supp. 644, 648.)

It is equally important to an informed consumer public that those expert in analyzing products, and the advertising claims made in behalf of those products, publish their analyses and opinions. Unless those analyses or opinions are defamatory the fact they may be critical of a product or an advertisement and thus harm the producer economically cannot be the basis of a cause of action for intentional infliction of economic injury.

As we discussed in detail above, Pilgrim fails to satisfy First Amendment requirements. We therefore do not reach the merits of whether Pilgrim adequately pleaded the five elements listed above.

As mandated by *Milkovich* v. *Lorain Journal Co.*, *supra*, 497 U.S. at pages 17-18 [111 L.Ed.2d at pages 16-17, 110 S.Ct. at page 2705], we have made

an independent examination of the whole record in order to ensure there is no infringement of free expression. It is our considered opinion Pilgrim cannot state a cause of action for libel or interference with prospective economic advantage based on the commentary because it is nonactionable analysis which does not imply facts which are untrue and which is headed by a title that, at worst, is protected "loose, figurative, or hyperbolic language." Therefore, we deny Pilgrim leave to amend its complaint.

Since we are sustaining the demurrer without leave to amend, we need not reach petitioners' motion to strike Pilgrim's request for punitive damages.

### DISPOSITION

Let a peremptory writ of mandate issue, commanding the trial court to vacate its order overruling petitioners' demurrer to the complaint and to sustain said demurrer without leave to amend.

Lillie, P. J., and Woods (Fred), J., concurred.