# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| STEPHEN G. PERLMAN, REARDEN LLC, a California limited liability company, and ARTEMIS NETWORKS LLC, a Delaware limited liability company,<br><br>    Plaintiffs,<br><br>  v.<br><br>VOX MEDIA, INC., a Delaware corporation,<br><br>    Defendant. | Civil Action No. 10046-VCP |

## MEMORANDUM OPINION

Date Submitted: June 10, 2015
Date Decided: September 30, 2015

Matthew E. Fischer, Esq., Jacob R. Kirkham, Esq., Jacqueline A. Rogers, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Neville L. Johnson, Esq., Douglas L. Johnson, Esq., James T. Ryan, Esq., JOHNSON & JOHNSON, LLP, Beverly Hills, California; *Attorneys for Plaintiffs, Stephen G. Perlman, Rearden LLC, and Artemis Networks LLC*.

Peter L. Frattarelli, Esq., ARCHER & GREINER, P.C., Wilmington, Delaware; *Attorneys for Defendant, Vox Media, Inc*.

**PARSONS, Vice Chancellor.**

This is an action by a Delaware limited liability company ("LLC"), a California LLC, and an entrepreneur seeking equitable relief and money damages against a Delaware corporation for defamation. The corporation owns and operates a website that, in 2012, published an allegedly defamatory article about a non-party Delaware corporation that is affiliated closely with the Delaware LLC and the entrepreneur. After the website rewrote substantially the article that same day and admitted publicly that it was not vetted properly, the website published another article several days later that the plaintiffs allege is false and defamatory. Then, in 2014, the website published an article about the Delaware LLC that, in its first sentence, referenced and hyperlinked the 2012 articles, allegedly repeated and enhanced the original statements, and imputed those allegedly false and defamatory statements to the Delaware LLC. The corporation moved to dismiss the complaint for failure to state a claim. As to two of the plaintiffs, the corporation argues that their claims arising from the 2012 articles are time-barred under California law and the 2014 article is substantially true. The defendant asserts that none of the challenged statements are defamatory as to the third plaintiff as a matter of law.

For the reasons that follow, I deny the defendant's motion. Taking all well-pled allegations of fact as true and drawing all reasonable inferences in favor of the plaintiffs, the complaint pleads facts sufficient to support claims for defamation against the defendant by all three plaintiffs. As to the defendant's assertion that two of the plaintiffs' claims as to the 2012 articles are time-barred, I conclude the defendant has failed to carry its burden of establishing that affirmative defense. Similarly, as to claims arising from

1

the 2014 articles, I conclude the defendant has failed to show that the plaintiffs cannot prove the statements were false and defamatory under any reasonably conceivable set of circumstances. Finally, I find it is reasonably conceivable that plaintiffs could prove the 2014 article republished the allegedly false and defamatory statements in the 2012 articles.

## I. BACKGROUND[1]

### A. The Parties

Plaintiff Stephen G. Perlman is the President and Chief Executive Officer of Plaintiffs Rearden LLC ("Rearden") and Artemis Networks LLC ("Artemis"). Perlman wholly owns Rearden, which wholly owns Artemis. Perlman is an entrepreneur and inventor who is responsible for several innovations in Internet, entertainment, multimedia, consumer electronics, and communications technologies and services.

Rearden, a technology development and incubation company, is a California LLC operating in several states and countries. In addition to founding and incubating Artemis, Rearden also founded and incubated OnLive, Inc.

Artemis is a Delaware LLC. Artemis developed pCell technology (formerly named "DIDO" technology), which allows wireless users to utilize full-speed wireless data rates regardless of how many users are sharing the same wireless data spectrum.

---

[1] The facts are drawn from the well-pled allegations of Plaintiff's Verified Second Amended Complaint (the "Complaint" or "Compl."), which are assumed true for purposes of the defendant's motion to dismiss, as well as documents integral to the Complaint or incorporated by reference therein.

Rather than offer services or products to consumers directly, Artemis offers pCell as a service to commercial customers, such as mobile wireless operators.

Defendant, Vox Media, Inc. ("Vox"), a Delaware corporation, owns and operates The Verge website (www.theverge.com), Polygon (www.polygon.com), Vox (www.vox.com), and SB Nation (www.sbnation.com). Vox holds itself out as one of the country's largest and fastest growing online publishers that owns and operates sites in distinct vertical categories, such as general news, sports, technology and culture, gaming, dining and nightlife, shopping and fashion, and design and real estate. Vox generates revenue through advertising on its websites and tends to charge advertisers more for generating a higher number of page views. Thus, Vox's goal is to generate as much interest and as many page views as possible.

### B. Facts

### 1. Events at OnLive

Perlman, through Rearden, founded OnLive in 2003 as a California S-corporation. He served as its President, CEO, and Chairman. In 2007, OnLive merged out of the California S-corporation and into a Delaware C-corporation, retained its name, and began operating as a standalone entity engaged in the development of an online video game streaming service, a remote Windows desktop service, and a television video game console. OnLive marketed these services directly to consumers. In 2009, OnLive announced its "OnLive® Game Service" and "OnLive MicroConsole TV adapter" and began testing its remote Windows desktop service. OnLive launched the OnLive Game Service in the United States in June 2010 and in the United Kingdom in September 2011.

3

OnLive introduced "OnLive® Desktop," the Windows desktop service, in early 2012. The OnLive Game Service and OnLive Desktop were regarded as major technology breakthroughs. They received wide press coverage and earned accolades and awards.

When OnLive was unable to raise enough capital to cover its operations overhead, it completed an Assignment for the Benefit of Creditors (the "ABC") on August 17, 2012. An assignee acquired all of OnLive's assets and assigned them to a successor entity, OL2, Inc. ("OL2"). OL2 hired approximately half of the former employees and continued doing business using the OnLive name. The Complaint is silent on what, if any, consideration was paid by OL2 for any of the assets it acquired.

Although Perlman did not join OL2 following the ABC, he remained Chairman of the corporate shell OnLive allegedly to ensure the OnLive Game Service and OnLive Desktop, which were then owned by OL2, both continued to operate securely and without interruption through the transition to OL2. The Complaint alleges that, beginning with OnLive's launch, all of its services have remained secure and in continuous operation, including through the ABC, OL2 taking over operations, and to this day. Finally, OnLive itself was never dissolved and remains "active" and in good standing to this day, presumably as a corporate shell.

### 2. The 2012 Articles

#### a. August 19 Articles

On August 19, 2012, Vox, through The Verge, published an article titled, "OnLive's bankruptcy protection filing leaves former employees in the dark" (the "August 19 Article"). The Complaint alleges that the August 19 Article contained the

4

following four falsehoods, which The Verge obtained from an unreliable source, Kevin Dent. First, Perlman, while Chairman and CEO of OnLive, engaged in a scheme to profit from the ABC at the expense of OnLive and its employees. In particular, the article cited Dent's belief that Perlman, through Rearden, owned the patented technology used by OnLive, and, by transferring OnLive and keeping the patents, Perlman was able to restart OnLive with new investors without having to pay OnLive's staff their share of its equity. Second, OnLive's corporate investors went along with Perlman's scheme to profit from the ABC because they had their investments refunded. Third, in response to a truthful press release, the August 19 Article stated, "[Perlman] just lied to the press. . . . What journalist is ever going to trust OnLive again?" Fourth, the August 19 Article accused Perlman and his companies of engaging in criminal activity, stating, "[t]he whole structure of this seems like a Ponzi scheme where you have your original investor, Rearden Labs, and they're getting all of their money back and Perlman has now transferred some of his IP over." Plaintiff alleges that these statements were false and that Defendant knew or should have known they were false when it published them.

That same day, representatives of OL2 spoke with an editor of The Verge about the falsehoods. Upon confirming with the U.S. Patent and Trademark Office's website that OnLive had owned the patents, rather than Perlman or Rearden, as the article had alleged, the editor agreed to remove the article. With the exception of the first four sentences, however, The Verge, through co-author Sean Hollister, rewrote the article in its entirety, including a one-sentence disclaimer at the bottom, saying, "Update: This story has been heavily modified from its original version, which contained inaccuracies."

5

In fact, The Verge's then editor-in-chief, Joshua Topolsky, later characterized it as a "rewrite" in the following statement:

> Long story short, the piece that was originally published was posted last night without oversight from our senior editorial team, and contained quotes and facts which [sic] were not properly vetted. There was much to the story that *was* accurate, but it required what was essentially a rewrite once our senior staff went over it. . . .
>
> . . . [S]ome of the typical editing phases we have at the Verge weren't followed. Also, because they were on an overnight schedule and it was a weekend, much of our staff wasn't available (both Verge and Polygon).[2]

Even though The Verge rewrote the original August 19 Article that same day, the Complaint alleges that the original article harmed Plaintiffs' reputations and various uncorrected references to the August 19 Article continue to cause such harm to this day. In the short period during which the uncorrected August 19 Article was available on The Verge's website, it attracted a large number of readers and comments and was shared widely and cited across the Internet and social media networks throughout the United States and internationally. On August 20, 2012, for example, the website Tencent QQ, a Chinese website with approximately 800 million active accounts, translated into Chinese and published portions of the original August 19 Article, including allegedly false allegations contained therein. In addition, on August 21, 2012, the website Techrights.org, which reports on a variety of issues relating to computing, including software patents, cited to the August 19 Article and quoted purportedly false allegations

---

[2]     Compl. ¶ 41 (emphasis original).

that Perlman and Rearden defrauded OnLive's staff and engaged in unethical business practices. Also, on August 19, 2012, Ron Amadeo, the Reviews Editor for Ars Technica, a highly regarded and influential technology web publication, cited to and quoted the August 19 Article on his Google+ account and added the following commentary: "Wow man. So give employees shares in Company A, funnel the value those employees create to a Company B, and then close Company A, fire all the employees, and leave them with nothing? #f\*\*\*OnLive."[3]

### b. August 28 Article

Several days later, The Verge published a new piece on Perlman and OnLive, titled, "OnLive lost: how the paradise of streaming games was undone by one man's ego" (the "August 28 Article").[4] Even though Hollister, who rewrote the first article because of its inaccuracies and falsehoods, also wrote the August 28 Article, he chose not to fact-check it, saying in an email to OL2's Public Relations Director, Jane Anderson:

> Just wanted to give you a heads up that we're going to be running with a report that I don't think you'll like very much…
>
> I originally wanted to reach out to you and go through a process and maybe get some of Steve's perspective (which

---

[3] Compl. ¶ 83 (asterisks added). Amadeo posts regularly about technology-related topics on his Google+ account, which was followed by over 25,000 people and viewed over 14 million times as of the commencement of this action.

[4] Sean Hollister, *OnLive Lost: How the Paradise of Streaming Games Was Undone by One Man's Ego*, THE VERGE (Aug. 28, 2012), http://www.theverge.com/2012/8/28/3274739/onlive-report (last visited Sept. 24, 2015).

I'd still like, honestly!) but the team decided I'd done enough interviewing already and that the story was getting away from me.

I just don't want you to read this and have an aneurysm or anything! You're far too nice for that![5]

Anderson replied within ten minutes offering to fact-check off the record, but Hollister did not respond.

The August 28 Article included a photograph of an OnLive stock certificate allegedly issued to an anonymous source whose name had been blacked out. The month and day of issue also were blacked out, but the year and number of shares printed on the certificate were altered to appear as if the certificate had come from a source within OnLive more senior than the anonymous source. Plaintiffs assert that this document is a forgery, detectable only through expert analysis, and that it was a deliberate attempt to lend credibility to the article's false allegations.

The Complaint challenges the reliability of the anonymous sources used in the August 28 Article, alleging they were former OnLive employees, current OL2 employees, and others who had read and believed the false and defamatory statements contained in the August 19 Article before it was revised. Further, Plaintiffs allege that Defendant knew or should have known that a primary anonymous source for the August 28 Article was highly—and obviously—unreliable, was not in a position at OnLive to have knowledge of the facts alleged in the article, and had a history of mental problems.

---

[5]    Compl. ¶ 46.

According to the Complaint, these facts demonstrate Vox's motive to vindicate itself for the embarrassment it incurred as a result of the August 19 rewrite, publish a sensationalistic article that its author acknowledged might cause OL2's Public Relations Director to "have an aneurysm," and target Perlman and his companies—a topic that had proven popular among its readers the previous week.

The August 28 Article allegedly contains many false statements about Plaintiffs. These statements allegedly perpetuate Vox's false narrative about Perlman's scheme to profit from the ABC and relate to the treatment of OnLive employees following the ABC, the number of OnLive Game Service's registered users, certain business transactions and potential offers to acquire OnLive, the operations and corporate governance of OnLive, and the ABC. Plaintiffs assert that the following represent a sample of the false, misleading, or inaccurate statements in the August 28 Article:

- "One manager told us that [Mr. Perlman] outvoted the board of directors on occasion."

- "…Perlman had seemingly found a legal loophole to extract that value and deprived them [OnLive's employees] of it in the process."

- "Perlman transferred all of OnLive's assets to a brand new company and took over as CEO, hiring back only a skeleton crew to keep the ship afloat."

- "[Perlman had] allegedly turned down offers from Sony, Dell and Adobe in the past. . . . If OnLive had sold to any of the bidders Perlman rejected, they [employees] claim, they might have been able to cash out [their stock]."

- "Two Fridays ago, Steve Perlman told the 200 employees of cloud gaming company OnLive that it was all his fault."

9

- "… the company … only ever had 1,600 concurrent users of the service worldwide. Over the past week, OnLive has tried to distance itself from the 1,600 number, but every former employee we spoke to in a position to know told us that it was true."

- "Former staffers told us Mass Effect 2 and Dragon Age: Origins were ready and would have launched on day one if it wasn't for Steve Perlman. . . . Perlman told EA he wanted exclusivity . . . When EA refused, Perlman ordered his staff to remove all EA titles from OnLive."

- "[Mr. Perlman] threatened to cease doing business with [Ubisoft]."

- "Employees convinced the new owner, Lauder Partners, to let Steve Perlman go."

- "When Nvidia offered possible solutions, though, employees told us the company decided not to negotiate."

- "Perlman also allegedly scared Valve off with a broad pitch when the company merely wanted to test the waters."

- "It didn't look like Perlman was interested in saving the firm."[6]

Finally, the August 28 Article contained embedded links to prior articles about Perlman, which he alleges cast him and his companies in a negative light. Specifically, Plaintiffs allege that "[t]his ready and deliberate access to all of defendant's articles on Mr. Perlman and his companies associate the defamatory statements from the original August 19 Article and the August 28 Article with Mr. Perlman's other companies— specifically with Artemis."

---

[6]     Compl. ¶¶ 56a-t.

In the first fifteen minutes after The Verge published the August 28 Article, various journalists and editors associated with The Verge, Polygon, and Vox promoted the article as the "definitive account" based on "exhaustive proof," despite the fact that they had not fact-checked the article with OL2, using social media platforms such as Facebook, LinkedIn, Twitter, Tumblr, and Google+ to reach hundreds of thousands, if not millions, of readers. Readers quickly posted 300 comments (288 in the first two days) responding to the August 28 Article, and the article spread rapidly through social media networks. Soon the August 28 Article became a top Google search result for "OnLive," behind only OnLive's own corporate and service web pages and the OnLive Wikipedia page. In fact, two years later the August 28 Article was still the fourth Google result for "OnLive." Also, when Internet users use Google to search for "Steve Perlman," Google provides three "In-depth articles," which it identifies as "high-quality content to help [users] learn about or explore a subject;" the August 28 Article appears alongside two articles from www.businessweek.com and www.smithsonianmag.com, respectively, both highly credible publications.[7]

---

[7] For an analysis of the impact of Google's "In-depth article" feature on a subject's reputation, Plaintiffs cite David Goldman and Richard Dukas, *How Google's 'In-Depth Articles' feature could affect PR*, PR Daily (Aug. 30, 2013), http://www.prdaily.com/Main/Articles/How_Googles_InDepth_Articles_feature_could_affect_15110.aspx ("From our study of consumer-facing Fortune 500 companies, 65 percent of the newly designated in-depth articles were unfavorable . . . . These articles can have a persistent debilitating effect on a company. . . . Given that Google's algorithm has selected these stories as in-depth articles, these unfavorable results are unlikely to be displaced by tomorrows news. Increased activity on the corporate Twitter, Facebook, or Flickr accounts will not displace this content either.").

In addition, several websites cite, link to, or discuss the August 28 Article. GamesIndustry.biz links to the article, has a picture of Perlman, and summarizes false allegations, including the alleged number of peak subscribers and number of employees hired by OL2. MCV UK links to and summarizes the article, and VG 24/7 also links to and summarizes the article. Anderson's efforts to persuade the staffs of these respective websites to remove references to the article were unsuccessful.

On March 10, 2014, the MIT Technology Review published an article about Perlman and pCell (the "MIT Article"). As originally published, the MIT Article linked to the August 28 Article when discussing Perlman's history at OnLive. Artemis contacted the author immediately to request that the link be removed based on its false content. After Artemis provided a few examples of the false allegations contained in the August 28 Article, the MIT Article's author allegedly determined that the August 28 Article was not a credible source and replaced the link with another to a Wall Street Journal article. By then, however, the MIT Technology Review already had translated the original MIT Article, including the link to the August 28 Article, into Spanish and posted it on its Spain website. It later was copied to another Spanish language news website, BBVA. Artemis attempted to have these Spanish versions corrected, but it did not succeed.

### 3.     The 2014 Article

On February 19, 2014, pCell received prominent press at the top of the front page of the New York Times business section, in a live interview of Perlman on Bloomberg Television, and by Wired Magazine, among others. That same day, Vox published an

article about pCell and Perlman's operations with Artemis titled, "The man behind OnLive has a plan to fix your terrible cell phone service" (the "2014 Article") that generated a lot of traffic for its website, The Verge. Plaintiffs allege that because OnLive and OL2 sell remote Windows desktop and video game services to consumers, and Artemis sells wireless services to commercial mobile wireless operators, the 2014 Article catered to and reached a separate and distinct market and audience than the 2012 Articles had.

The 2014 Article opened with the following sentence, including a hyperlink to the August 28 Article, which Plaintiffs allege is defamatory: "Steve Perlman, the creator of the **defunct game-streaming service OnLive**, claims he has the answer to slow wireless service."[8] Thus, before the wireless industry read anything in the 2014 Article about Artemis or pCell, it read that one of Perlman's previous services is now defunct. But, the Complaint alleges that far from being defunct, the OnLive Game Service has been active since its launch in 2010 and remained an active game-streaming service at least until Plaintiffs filed this action. Further, OnLive and OL2 continue to be Delaware corporations in good standing. Thus, Plaintiffs argue, this first sentence is a new, unfavorable, and defamatory allegation that updates and continues the disparaging narrative of the 2012 Articles.

---

[8]     Compl. ¶ 68 (bold and underlining in original). The bold, underlined text is a hyperlink that, when clicked, forwards readers to the August 28 Article, which itself contains a hyperlink to the August 19 Article.

Specifically, the Complaint avers that "defunct" conveys that the OnLive services, and OnLive itself, no longer exist.[9] As to OnLive's Game Service and Remote Desktop service, Plaintiffs assert that "defunct" tells readers that users' personal information (including messages, login information, Word and Excel files, etc.) is no longer accessible on an uninterrupted basis or secure from hacker attacks. As to OnLive itself, "defunct" purportedly tells readers the company no longer exists, which is confirmed by the August 28 Article and the allegedly defamatory statements therein impugning the competence, ethics, and governance of OnLive and Perlman.

Finally, Plaintiffs allege that the 2014 Article defames Artemis because it compares Artemis's pCell wireless service (which is the subject of the article) with the "defunct" OnLive Game Service, suggesting to readers that the pCell wireless service will meet a similar end: "OnLive, which like pCell seemed impossibly ambitious when it first debuted, delivered on the initial promise, but the company failed to turn its ambition into profit."[10]

### 4. Damage to Plaintiffs

Plaintiffs allege that Defendant's libelous articles caused them irreparable harm, including lost business opportunities and investments. In particular, Vox's false and misleading statements allegedly caused readers and potential investors to view Plaintiffs' businesses as non-viable, dishonest, and non-reputable and to question Perlman's

---

[9] Compl. ¶¶ 70-71.

[10] Compl. ¶ 72.

14

competency in managing a well-funded start-up. These questions related to subjects such as whether Perlman will turn down acquisition offers that will result in investor liquidity, whether Perlman will override board decisions, and whether Perlman will be able to attract top-tier talent to work for him given the false allegations of fiduciary misconduct and self-dealing. Plaintiffs provide the following two examples of the harm they allegedly have suffered.

First, a potential major foreign investor in Artemis stated that it was impressed with Artemis's technology and business prospects after conducting due diligence visits and intended to invest $100 million in Artemis and deploy Artemis's technology in several countries through mobile operators that the investor controlled. On a later visit, however, the investor stated, in front of Artemis's executive staff, that a foreign business associate had referred the investor to the August 28 Article and its allegations had raised a number of serious concerns about Perlman. Despite efforts by Perlman and other former OnLive employees then working at Artemis to explain that the August 28 Article's allegations were false, the investor declined to invest in or deploy the Artemis technology.

Second, a major U.S. venture capital firm expressed an intention to invest $100 million in Artemis after having conducted extensive technical and business due diligence. The entire partnership, consisting of more than a dozen partners, traveled to Artemis's office for a business presentation and demonstration of Artemis's technology. At the end of the meeting, one partner remarked that, based on what the August 28 Article revealed about Perlman, he did not think Perlman would be able to attract the talent needed to

15

build up the company. Perlman explained that the August 28 Article was false and noted that top OnLive employees were working at Artemis and that Artemis had received hundreds of top-talent resumes as evidence of his ability to attract top talent. The former OnLive employees then working for Artemis also confirmed the falsity of the August 28 Article and vouched for Perlman.

As the meeting continued, allegation after allegation from the August 28 Article was raised before the partnership. Defending against so many allegations transformed what was meant to be a closing meeting for a $100 million investment in Artemis's breakthrough wireless technology into an attempt to explain a long list of false allegations of fiduciary misconduct that never occurred. Ultimately, the firm declined to invest in Artemis based on concerns arising from the August 28 Article, despite the firm's confidence in the value of the technology, the business, and Perlman's track record.

Plaintiffs allege, and I consider it reasonable to infer, that the decision to invest tens or hundreds of millions of dollars in a technology start-up like Artemis depends heavily on Perlman's reputation. Before publication of Vox's libelous articles, Perlman had raised funding at these levels for prior start-ups with weaker prospects than Artemis and in worse economies, including during the 2002 and 2008 recessions. Plaintiffs aver, however, that the allegedly libelous articles paint a negative picture of Perlman and undermined his ability to raise funding for Artemis's breakthrough wireless technology even at a time of demand for its benefits.

16

## C.    Procedural History

Plaintiffs first filed this defamation action on August 18, 2014, and filed a Verified First Amended Complaint on September 24, 2014.  On October 17, 2014, Vox moved to dismiss.  Plaintiffs moved to amend their complaint further on December 10, 2014.  The Court granted the unopposed motion to amend by Order dated December 23, 2014.  On December 24, Plaintiffs filed their Verified Second Amended Complaint, which is the operative complaint and seeks damages and injunctive relief in connection with allegedly defamatory statements made in three articles published by Vox's website, The Verge.  Count I pleads a cause of action for defamation based on the 2012 Articles and the 2014 Article.  Count II seeks a permanent and mandatory injunction to remedy allegedly continuing harm to Plaintiffs' reputations, businesses, and future business endeavors arising from the defamatory articles by declaring that the articles contain false and defamatory statements about Plaintiffs and requiring Vox to: (1) remove all libelous articles and related hyperlinks from any of its websites; and (2) publish and promote a retraction of the articles.

On January 15, 2015, Vox moved to dismiss the Verified Second Amended Complaint for failure to state a claim as a matter of law.  After full briefing on that motion, I heard oral argument on it on June 10, 2015.

## D.    Parties' Contentions

Vox contends that all claims by Artemis must be dismissed due to the lack of any defamatory content in any of the articles as to Artemis.  Vox contends that the 2012 Articles do not mention Artemis and that the 2014 Article states only straightforward

17

facts about Artemis without attributing any defamatory meaning to Artemis. Vox further argues that all claims by Plaintiffs Perlman and Rearden must be dismissed on an article-by-article basis. First, it asserts that Perlman's and Rearden's claims as to the 2012 Articles are time-barred by California's one-year statute of limitations and the 2014 Article did not "republish" the 2012 Articles. Second, according to Vox, Perlman's and Rearden's claims as to the 2014 Article fail because the statement pursued, that OnLive is "defunct," is not defamatory as a matter of law under the substantial truth doctrine.

In opposition to Defendant's motion to dismiss, Plaintiffs contend that the 2014 Article republished the 2012 Articles, thereby restarting the statute of limitations as to the claims by all Plaintiffs. In that regard, Plaintiffs assert that the 2014 Article both enhanced or revised the 2012 Articles and directed the defamatory 2012 Articles to a new audience. Plaintiffs further argue that the defamatory statements about Perlman in the 2012 Articles are also defamatory as to Artemis because Perlman is identified so closely with Artemis that statements defaming him defame Artemis. Finally, Plaintiffs contend that Delaware's two-year statute of limitations should apply because Delaware has the most significant relationship to the parties and their claims. Alternatively, they aver that, even if California's one-year statute of limitation applies, this Court's equity jurisdiction requires application of a laches analysis under which Plaintiffs' delay in asserting their claims was neither unreasonable nor prejudicial to Defendant.

18

## II. ANALYSIS

### A. Standard of Review

Pursuant to Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief. As reaffirmed by the Supreme Court, "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[11] That is, when considering such a motion, a court must "accept all well-pleaded factual allegations in the Complaint as true, . . . draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[12]

This reasonable "conceivability" standard asks whether there is a "possibility" of recovery.[13] If the well-pled factual allegations of the complaint would entitle the plaintiff to relief under a reasonably conceivable set of circumstances, the court must deny the motion to dismiss.[14] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-

---

[11] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (footnote omitted).

[12] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[13] *Id.* at 537 & n.13.

[14] *Id.* at 536.

moving party."[15]  Moreover, failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim.[16]

Generally, the Court will consider only the pleadings on a motion to dismiss under Court of Chancery Rule 12(b)(6).  "A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents."[17]  Additionally, the Court may take judicial notice of a fact if that fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."[18]

---

[15]     *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[16]     *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000) (Steele, V.C., by designation).

[17]     *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995) (observing that courts consider the relevant publication in libel cases on a Rule 12(b)(6) motion without converting the motion to one for summary judgment).

[18]     *Fawcett v. State*, 697 A.2d 385, 388 (Del. 1997) (citing D.R.E. 201(b)).  "On a motion to dismiss the Court is free to take judicial notice of certain acts that are of public record if they are provided to the Court by the party seeking to have them considered."  *Shellburne Civic Ass'n, Inc. v. Brandywine Sch. Dist.*, 2006 WL 2588959, at *6 n.3 (Del. Ch. Sept. 1, 2006) (quoting *In re Wheelabrator Techs., Inc. S'holders Litig.*, 1992 WL 212595, at *12 (Del. Ch. Sept. 1, 1992).

20

## B. The 2012 Articles

### 1. Are Perlman's and Rearden's claims as to the 2012 Articles time-barred?

Defendant argues that this Court must follow the statute of limitations in this case and dismiss Perlman's and Rearden's claims arising from the 2012 Articles as untimely.[19] Relying on *Shearin v. E.F. Hutton Group, Inc.*, Defendant argues that "[a] request for injunctive relief can get a defamation action into Chancery in the first place, but it does not alone justify the court in not applying the same limitations provision as would apply were the facts brought before the Superior Court."[20] For the following reasons, I decline to apply the statute of limitations and conduct a laches analysis instead.

Two Delaware Supreme Court cases, *Reid v. Spazio*[21] and *IAC/InterActiveCorp v. O'Brien*,[22] are instructive on this issue. In *Reid*, the Supreme Court said, "[u]nder ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law; but, if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer period than that fixed by the statute, the [court] will not be bound by the statute, but will determine the

---

[19]     Plaintiffs conceded at oral argument that Artemis's claim is tied to the defamation of Perlman through the republication of the 2012 Articles in connection with the 2014 Article. Tr. 6. Thus, I discuss Artemis's claim *infra*.

[20]     652 A.2d 578, 584 (Del. Ch. 1994).

[21]     970 A.2d 176 (Del. 2009).

[22]     26 A.3d 174 (Del. 2011).

21

extraordinary case in accordance with the equities which condition it."[23]  "Although both laches and statutes of limitation operate to time-bar suits," the Supreme Court in *Reid* explained, "the limitations of actions applicable in a court of law are not controlling in equity.  A court of equity moves upon considerations of conscience, good faith, and reasonable diligence."[24]

The Delaware Supreme Court reaffirmed this analysis two years later in *O'Brien*. There, the appellant-defendant argued that the Court of Chancery had erred when it found the appellee-plaintiff's indemnification claim, a contract claim at law, to be timely by applying laches instead of the relevant three-year statute of limitations.  The Supreme Court affirmed the Court of Chancery's determination that *O'Brien* was one of the few cases where the analogous statute of limitations should not be applied because of unusual conditions or extraordinary circumstances.[25]  The Supreme Court further affirmed that in determining whether the facts of the case constituted unusual conditions or extraordinary circumstances, the Court of Chancery exercised its discretion appropriately in considering all relevant factors, as discussed in greater detail *infra*.[26]  Thus, I conclude that, notwithstanding any contrary language in *Shearin*, this Court may conduct a laches

---

[23]     *Reid*, 970 A.2d at 183 (quoting *Wright v. Scotton*, 121 A. 69, 72-73 (Del. 1923)). *See also Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982); *U.S. Cellular Inv. Co. v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996); 2 POMEROY'S EQUITY JURISPRUDENCE § 419a (5th ed. 1941).

[24]     *Reid*, 970 A.2d at 183 (citations omitted).

[25]     *O'Brien*, 26 A.3d at 178.

[26]     *Id.*

22

analysis here in accordance with *Reid* and *O'Brien* and decide Defendant's timeliness arguments on that basis.

To determine whether Perlman's and Rearden's claims as to the 2012 Articles are time-barred, I first must identify the analogous statute of limitations. To determine the appropriate limitations period for defamation claims, however, I must decide which state's substantive law applies. In conducting a laches analysis, I then determine whether, even if Plaintiffs' claims were brought after the analogous limitations period expired, this is one of those few occasions where the analogous statute of limitations should not be controlling because of "unusual conditions or extraordinary circumstances."

### a. Choice of law

Defendant argues that this Court must apply California substantive law to Perlman's and Rearden's defamation claims. When determining which state's substantive laws apply, Delaware courts generally rely on the Restatement (Second) of Conflict of Laws (the "Restatement 2d of Conflicts").[27] Under the Restatement 2d of Conflicts, allegedly defamatory statements published over the Internet are treated as "multistate" or "aggregate" communications.[28] Thus, any claim arising from an Internet

---

[27] *Smith v. Del. State Univ.*, 47 A.3d 472, 480 (Del. 2012) (applying the Restatement 2d of Conflicts' "most significant relationship" test to a defamation claim).

[28] *Aoki v. Benihana, Inc.*, 839 F. Supp. 2d 759, 765 (D. Del. 2012) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS (Restatement 2d of Conflicts) § 150).

23

communication is governed by the law of the state with the "most significant relationship" to the claim.[29] In determining the most significant relationship, the Court evaluates the relative importance of: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered."[30]

"The state where the injured party is domiciled (for natural persons) or has its principal place of business (for corporations or other legal persons . . .) will usually be the state of most significant relationship for claims of defamation by an aggregate communication that was published in that state."[31] This is because "defamation produces a special kind of injury that has its principal effect among one's friends, acquaintances, neighbors and business associates in the place of one's residence."[32] Accordingly, under the Restatement 2d of Conflicts and Delaware law, the local law of the state of the plaintiff's domicile applies "unless, with respect to the particular issue, one of the other states has a more significant relationship to the occurrence and the parties."[33]

---

[29]    *See id.*; Restatement 2d of Conflicts §§ 145, 150.

[30]    Restatement 2d of Conflicts § 145.

[31]    *Aoki*, 839 F. Supp. 2d at 765 (citing Restatement 2d of Conflicts § 150(2), (3)).

[32]    *Id.* (quoting *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 622 (8th Cir. 2004) (noting that this conclusion was reached under consideration of Restatement 2d of Conflicts § 150)).

[33]    Restatement 2d of Conflicts § 150, cmt. e.

24

Plaintiffs argue that, because the defamatory allegations contained in the 2012 Articles relate exclusively and directly to Perlman's conduct as a fiduciary of a Delaware corporation, the Complaint focuses on activity of Plaintiffs' that is located principally in Delaware and, thus, Delaware substantive law should apply. Plaintiffs also argue that Delaware has the most significant relationship to the parties. Vox is a Delaware corporation that published the defamatory articles about Perlman, a Delaware fiduciary, in his capacity as the Chairman and CEO of OnLive, a Delaware company. Artemis also is a company formed under the laws of Delaware. Rearden is a California company, but the vast majority of the companies it incubated and controls are formed under the laws of Delaware. As such, Plaintiffs argue that they are better known in Delaware than in California regarding Perlman's actions as an officer and director and Artemis's and Rearden's business activities. These facts, Plaintiffs contend, support the conclusion that Delaware is the state in which the allegedly defamatory communication caused them the greatest injury to their reputations.

I disagree. The facts of this case are similar to those at issue in *Aoki v. Benihana, Inc.*[34] There, the defendant argued that Florida had the most significant relationship pursuant to Sections 6 and 145 of the Restatement 2d of Conflicts based on the issue of "whether a press release, written and issued in Florida by a Florida headquartered corporation, accurately reflects allegations made in a Florida [l]awsuit by that Florida-headquartered corporation, against one Florida defendant, and involving the actions of all

---

[34] 839 F. Supp. 2d at 768.

25

defendants in Florida, causing injury of that Florida-headquartered corporation in Florida."[35] Despite the *Aoki* defendant's argument that the harm at issue occurred in Florida and arose out of a Florida lawsuit involving Florida parties, the court gave the greatest weight to the residence of the injured parties and applied New York law.[36]

Here, Perlman argues that he occupies residences in several states, including Florida and California, and conducts his business operations throughout the United States and globally. Public patent filings, however, indicate Perlman's domicile is California. Because Perlman elected not to provide his permanent residence, the situs of his driver's license, or other facts supporting a non-California domicile, I conclude that he is a California resident. I reach the same conclusion as to Rearden, whose patent applications indicate its headquarters are in San Francisco, California. Thus, California's substantive law applies as to Perlman's and Rearden's claims arising from the 2012 Articles.

California has a one-year statute of limitations for defamation claims.[37] Delaware has a two-year statute of limitations for defamation claims.[38] Given this conflict between

---

[35]     *Id.* (citation omitted).

[36]     *Id.* Plaintiffs attempt to distinguish *Aoki*, in which one party disputed whether New York or Delaware law applied and the other party disputed whether New York or Florida law applied, by arguing that the parties there agreed that New York law applied. Therefore, Plaintiffs argue, the *Aoki* court's choice of law analysis was dicta and should be disregarded. I find that argument unpersuasive. Applying Delaware choice of law principles, the court said, "[t]he parties agree that applying the law of these states would yield different results and, therefore, a choice of law analysis is required." *Id.* at 764 (citation omitted). Thus, I do not consider the court's ultimate choice of New York substantive law to be dicta.

[37]     CAL. CIV. PROC. CODE § 340(c).

26

California's and Delaware's limitations periods, I look to Delaware's "borrowing statute" to determine which of the two limitations periods applies. That statute provides:

> Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of *whichever is shorter*, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply.[39]

Thus, here, where non-residents Perlman and Rearden bring defamation claims that arose in California, Delaware's borrowing statute mandates that the Court select the "shorter" of the two potentially-applicable limitations periods—*i.e.*, California's one-year statute of limitations.

### b.      Laches and the *O'Brien* factors

Laches is an equitable defense based on the maxim that "equity aids the vigilant, not those who slumber on their rights."[40] Laches is defined generally as an unreasonable delay in enforcing a right that causes prejudice to the defendant.[41] Therefore, "laches generally requires the establishment of three things: first, knowledge by the claimant; second, unreasonable delay in bringing the claim, and third, resulting prejudice to the

---

[38]     10 *Del. C.* § 8119.

[39]     10 *Del. C.* § 8121 (emphasis added).

[40]     *Adams*, 452 A.2d at 157.

[41]     *Reid*, 970 A.2d at 182.

27

defendant."[42]  The touchstone of a laches inquiry is whether inexcusable delay led to an adverse change in the condition or relations of the properties or parties.[43]  Nevertheless, even though statutes of limitations are not controlling in equity, the Court of Chancery places great weight on analogous limitations periods in determining whether a plaintiff's claim should be deemed barred by laches.[44]

Because the Court generally is limited to the facts appearing on the face of the pleadings in ruling on a motion to dismiss, affirmative defenses, such as laches, are not ordinarily well-suited for disposition on such a motion.[45]  Thus, unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate.  Here, facts appearing on the face of the Complaint, taken together with all reasonable inferences having been drawn in Plaintiffs' favor, indicate that Plaintiffs had knowledge of an enforceable right to sue Vox for defamation arising from the 2012 Articles, but nonetheless delayed enforcing that right for two years.  To receive the benefit of a laches defense at this preliminary stage, however, Defendant carries the burden of establishing not only prejudice, but also that Plaintiffs can prove no set of facts

---

[42]  *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005) (citation omitted).

[43]  *Adams*, 452 A.2d at 157.

[44]  *U.S. Cellular*, 677 A.2d at 502.

[45]  *See Malpiede v. Townson*, 780 A.2d 1075, 1082-83 (Del. 2001).

28

to avoid Defendant's affirmative defense. Turning to the *O'Brien* factors in that context, I conclude Defendant has not met its burden.

In *O'Brien*, the Supreme Court affirmed this Court's consideration of the following factors to determine whether "unusual conditions or exceptional circumstances" prevent application of the analogous statute of limitations: (1) whether the plaintiff had been pursuing his claim, through litigation or otherwise, before the statute of limitations expired; (2) whether the delay in filing suit was attributable to a material and unforeseeable change in the parties' personal or financial circumstances; (3) whether the delay in filing suit was attributable to a legal determination in another jurisdiction; (4) the extent to which the defendant was aware of, or participated in, any prior proceedings; and (5) whether, at the time the litigation was filed, there was a bona fide dispute as to the validity of the claim.[46]

Plaintiffs argue that this action was timely for three reasons. First, they contend that the allegations in the Complaint demonstrate that Plaintiffs responded to the 2012 Articles by exercising self-help rather than running to the courthouse. In other words, Plaintiffs spent time, effort, and money calling websites around the world that were republishing the 2012 Articles, bringing to their attention the defamation therein, and requesting that they remove the links. Plaintiffs argue that this Court, a court of equity, should encourage that form of self-help rather than fault it. Second, and relatedly, Plaintiffs argue that it was not until it began to lose $100 million investors after

---

[46] *O'Brien*, 26 A.3d at 178.

29

Defendant published the 2014 Article that Plaintiffs experienced and understood the full extent of the impact of the libelous publications on their reputations and business prospects. Finally, Plaintiffs argue that Defendant has not—and cannot—meet its burden in asserting a laches defense on a motion to dismiss.[47] For this reason alone, Plaintiffs argue that Vox's laches defense fails.

Defendant protests that Plaintiffs cite no cases for the proposition that an untimely defamation cause of action can be delayed until a plaintiff is aware of the "full extent" of the harm. On a motion to dismiss, however, Defendant carries the burden of persuasion when asserting a laches defense.[48] Here, Vox has not convinced me that there are no reasonably conceivable circumstances under which Plaintiffs could overcome Defendant's laches defense. Under *O'Brien*, I must exercise my discretion in considering all factors relevant to determining whether "unusual conditions or exceptional circumstances" prevent application of the analogous statute of limitations. I conclude it is reasonably conceivable that Plaintiffs did pursue their claim diligently and in good faith before the statute of limitations expired, even though they did so through self-help rather than litigation. Similarly, it is reasonably conceivable that Defendant was aware of Plaintiffs' extra-judicial efforts to remedy the harm to their reputations. Finally, and most importantly, Vox has not even argued that Plaintiffs' delay resulted in prejudice to

---

[47] *See Whittington v. Dragon Gp. L.L.C.*, 2010 WL 692584, at *8-9 (Del. Ch. Feb. 15, 2010) (finding "insufficient" prejudice), *aff'd & remanded*, 998 A.2d 852 (Del. 2010).

[48] *See Hudak v. Procek*, 806 A.2d 140, 153 (Del. 2002).

it, let alone persuaded me that Plaintiffs could not rebut such an allegation under any reasonably conceivable circumstances.

Because Defendant's laches defense is before me on a motion to dismiss under Rule 12(b)(6), Vox carries a heavy burden of proof. Having considered the arguments of Plaintiffs and Defendant, I hold that Vox has not shown that it is entitled to dismissal of Perlman's and Rearden's claims arising from the 2012 Articles based on laches and, therefore, I decline to grant Defendant's motion.

### C.        The 2014 Article

To sustain a cause of action for defamation, Plaintiffs must plead five elements: (1) defamatory communication; (2) publication; (3) reference to each Plaintiff asserting a claim; (4) a third party's understanding of the communication's defamatory character; and (5) injury.[49] For purposes of this motion to dismiss, Defendant does not challenge whether the 2012 Articles were false and defamatory, but argues that Plaintiffs' pleadings as to the 2014 Article were insufficient. Two statements on the face of the 2014 Article are relevant. First, the statement referring to "Steve Perlman, the creator of the defunct game-streaming service OnLive," is directly at issue. The second statement, *i.e.*, "OnLive, which like pCell seemed impossibly ambitious when it first debuted, delivered

---

[49]    *Giove v. Holden*, 2014 WL 975135, at \*5 (D. Del. Mar. 10, 2014) (citing *Read v. Carpenter*, 1995 WL 945544, at \*3 (Del. Super. June 8, 1995)). The parties did not address in depth the conflict of law issue as to Plaintiff Artemis. Artemis is a Delaware LLC; therefore, for purposes of this Memorandum Opinion, I assume its defamation claim based on the 2014 Article arguably is subject to Delaware law.

on its initial promise, but the company failed to turn its ambition into profit . . . ," is relevant in that it gives context to the first statement.

The content of the 2012 Articles, however, is also relevant to whether Plaintiffs stated a claim as to the 2014 Article for two reasons. The words "defunct game-streaming service OnLive" constituted a hyperlink in the first sentence of the 2014 Article, which, when clicked, connected readers directly to the 2012 Articles. For Artemis, which argues that it was harmed by the 2014 Article's incorporation by reference of the false and defamatory statements in the 2012 Articles, the content of the 2012 Articles is relevant because it provides background and context to the statement at issue in the 2014 Article. And for Perlman and Rearden, whose claims I presume are timely as to the 2012 Articles, as discussed *supra*, the 2014 Article purportedly republished the 2012 Articles by enhancing the defamatory statements therein and presenting them to a new audience.

Defendant argues that Vox's reference to "Steve Perlman, the creator of the defunct game-streaming service OnLive," is not actionable defamation because it is substantially true. Defendant also contends that, under well-settled California law, the hyperlink in the 2014 Article was not a republication of the 2012 Articles. I discuss these arguments below.

32

### 1.	Substantial truth

Under Delaware and California law, substantial truth is an affirmative defense to defamation.[50]  "The test in deciding whether an article is substantially true involves a consideration of whether the alleged libel was more damaging to plaintiff's reputation, in the mind of the average reader, than a truthful statement would have been.  As part of this evaluation, courts will consider whether the 'gist' or 'sting' of the article was true."[51]  On a motion to dismiss, however, Defendant retains the burden of proving that Plaintiffs cannot recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint.  Thus, as stated above, unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate.  Vox argues that this Court may consider its substantial truth defense on a motion to dismiss.  I agree, but, for the following reasons, conclude that it is not clear from the face

---

[50]     *See Giove*, 2014 WL 975135, at *5 (citing *Ramunno v. Cowley*, 705 A.2d 1029, 1035 (Del. 1998)) ("However, a statement of fact is not defamatory if it is "substantially true."); *Carver v. Bonds*, 135 Cal. App. 4th 328, 344-45, 37 Cal. Rptr. 3d 480, 493 (Cal. Ct. App. 2005) (citing *Masson v. New Yorker Magazine*, 501 U.S. 496, 516-17 (1991)) ("California law permits the defense of substantial truth, and thus a defendant is not liable if the substance of the charge be proved true . . . .  Put another way, the statement is not considered false unless it would have a different effect on the mind of the reader from that which the . . . truth would have produced.").

[51]     *Gannett Co. v. Re*, 496 A.2d 553, 557 (Del. 1985) (citing *Williams v. WCAU-TV*, 555 F. Supp. 198, 202 (E.D. Pa. 1983)).  *See also Masson*, 501 U.S. at 517; *Morningstar, Inc. v. Superior Court*, 23 Cal. App. 4th 676, 686, 29 Cal. Rptr. 2d 547 (Cal. Ct. App. 1994).

33

of the Complaint that Plaintiffs can prove no set of facts to avoid Vox's substantial truth defense.

Defendant has not established that Plaintiffs cannot prove the statements were false and defamatory under any reasonably conceivable set of circumstances susceptible of proof under the Complaint. "A defamatory communication is one that tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."[52] "The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express."[53] Here, Defendant argues that it is substantially true that the "game-streaming service OnLive" was "defunct" as alleged in the 2014 Article; Plaintiffs assert that the statement is false and defamatory.

In Delaware and in California, whether a communication is false is a question of fact.[54] Based on the well-pled facts alleged in the Complaint and reasonable inferences

---

[52] *Giove*, 2014 WL 975135, at *5 (citing *Henry v. Del. Law Sch. of Widener Univ., Inc.*, 1998 WL 15897, at *10 (Del. Ch. Jan. 12, 1998), and RESTATEMENT (SECOND) OF TORTS § 559 (1977)).

[53] RESTATEMENT (SECOND) OF TORTS § 563 (1977).

[54] *See Q-Tone Broad., Co. v. Musicradio of Md., Inc.*, 1994 WL 555391, at *5 (Del. Ch. Aug. 22, 1994) ("In its analysis of the content of an allegedly defamatory statement, the Court must look to the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence."); *Morningstar*, 23 Cal. App. 4th at 688 ("In determining whether statements are of a defamatory nature, and therefore actionable, a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of the complaint for libelous publication according to its natural and popular construction.").

drawn from them in favor of Plaintiffs, I conclude it is reasonably conceivable that

Plaintiffs will be able to prove the statement at issue in the 2014 Article is false.

Defendant disputes whether "defunct game-streaming service OnLive" refers to the

game-streaming service or to OnLive, Inc., the company. According to the Complaint,

however, neither of these interpretations are substantially true. The Complaint alleges

that both the game-streaming service OnLive and the corporate entity OnLive are alive

and well, *i.e.*, not defunct.[55] Any contrary argument that the statement, in isolation, is

substantially true would present a question of fact, which I cannot decide on a motion to

dismiss.

Defendant further asserts that the case law makes clear that context is paramount

in assessing substantial truth and that content contained in links in the body of an

allegedly defamatory article can provide that context.[56] As discussed in greater detail

---

[55] These facts are unlike those at issue in *Giove*, where the plaintiff alleged the defendant published false information in a neighborhood watch bulletin that the plaintiff was a convicted felon. 2014 WL 975135, at *5. The bulletin stated that the plaintiff had been convicted of Unlawful Sexual Intercourse in the First Degree, when in fact he had been convicted of Unlawful Sexual Intercourse in the Third Degree. *Id.* When the plaintiff was convicted, however, the court determined the incorrect statement was no more damaging to the plaintiff's reputation than the correct one in the mind of the average reader because both of the referenced crimes are felonies; in other words, the court determined the statement was substantially true. *Id.*

[56] *See, e.g.*, *Carver*, 135 Cal. App. 4th at 344, 37 Cal. Rptr. 3d at 493; *Ramada Inns, Inc. v. Dow Jones & Co.*, 543 A.2d 313, 325 (Del. Super. 1987). *See also* RESTATEMENT (SECOND) OF TORTS § 563, cmt. d ("The context of a defamatory imputation includes all parts of the communication that are ordinarily heard or read with it.").

*infra*, however, the content contained in the links that Defendant urges me to consider does not help Defendant's case. Relying on the content of hyperlinks to establish the substantial truth of a statement practically requires incorporating by reference all of the allegedly defamatory statements in the 2012 Articles. In addition, the link to a New York Times article cited in the Complaint that states that "OnLive remains an active game-streaming service to this day" provides a sufficient basis to infer that Defendant's statement that the game-streaming service was defunct conceivably may have been false. Finally, although Defendant avers that the author's use of the term "defunct" in the 2014 Article was a reference to OnLive, Inc., Plaintiffs have disputed this and thereby raised an issue of fact.[57] Thus, whether the "defunct" statement was defamatory cannot be resolved on a motion to dismiss.

## 2. Artemis

Defendant argues next that Plaintiffs do not, and cannot, allege any defamation as to Artemis. Specifically, the 2012 Articles do not mention Artemis, so they cannot be defamatory as to Artemis. Thus, Vox reasons by extension that the "linking back" in the 2014 Article is literally a link to a "dead end." For the following reasons, I disagree.

---

[57] Defendant argues that, to the extent Plaintiffs purport to assert a cause of action arising from the statement that the OnLive *service* is defunct, Plaintiffs have no standing to pursue such a claim because the OnLive service is wholly owned and operated by the separate entity, OL2. As I observed at argument, however, Perlman and the two Plaintiff entities are claiming that, by virtue of Vox's false statement, Vox impugned his business reputation and that of Rearden and Artemis and caused all three to lose business as a result. Thus, whether or not OL2 may have a claim, Plaintiffs alleged adequately that the statement is defamatory as to them, as discussed *infra*.

36

"[A] corporation is defamed by defamatory communications of its officers and directors only if those statements 'also reflect discredit upon the method by which the corporation conducts its business.'"[58] Here, I understand that the alleged defamation of Artemis all stems from the 2014 Article and its link to the 2012 Articles. Specifically, the alleged defamation is based on: (1) the statement, "Steve Perlman, the creator of the defunct game-streaming service OnLive"; (2) the defamatory content of the 2012 Articles incorporated by reference through the hyperlink; and (3) the statement, "OnLive, which like pCell seemed impossibly ambitious when it first debuted, delivered on its initial promise, but the company failed to turn its ambition into profit . . . ." These statements purportedly defame Artemis by reasserting defamation from the 2012 Articles, adding further defamatory allegations from 2014, and associating them with pCell and Artemis. According to the Complaint:

> The February 19 [2014] Article is defamatory to Artemis by comparing the pCell wireless service with the OnLive Game Service and suggesting that the pCell wireless service will become "defunct" like OnLive. The link to the August 28 [2012] Article is in the very first sentence of the February 19 Article in bold. That Artemis will suffer the same fate as OnLive is the explicit proposition of the February 19 Article given Mr. Perlman's position as President and CEO of Artemis coupled with a prominent link that disparages Mr. Perlman's tenure as CEO of OnLive. The February 19 Article further disparages Artemis, Mr. Perlman as Artemis's founder and CEO, and Rearden as the incubator of Artemis by alleging that the alleged past problems . . . at OnLive are

---

[58] *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *21 (Del. Ch. Oct. 23, 2002) (quoting RESTATEMENT (SECOND) OF TORTS § 561, cmt. b).

37

suggestive of future problems at Artemis and any other Perlman or Rearden venture.[59]

I conclude it is at least reasonably conceivable that Plaintiffs will be able to prove that the typical reader of the 2014 Article will associate Artemis with Perlman and Rearden and will understand that they should not invest with Artemis because of Perlman's history at OnLive as referenced by the hyperlink and set forth in the 2012 Articles. That is, it is reasonably conceivable that Plaintiffs could prove that the 2014 Article and its reference through the hyperlink in the first sentence of the Article to the defamatory allegations against Perlman in the 2012 Articles did reflect discredit upon the method by which Artemis conducts its business.

The facts of *Q-Tone Broadcasting Co. v. Musicradio of Maryland* are analogous.[60] There, an executive working for the plaintiff radio station's rival remarked to the owner of an advertising agency that advertised with the plaintiff that the plaintiff's "leading male executive was a homosexual who might be likely to 'put the move' on the client."[61] As the court later explained, "the allegations were deemed to discredit the plaintiff corporation in the method by which it conducted its business, thereby making the statements actionable by the corporation."[62] Thus, although the defamatory statement that the leading executive had homosexual "designs" towards the owner of the

[59]    Compl. ¶ 74.

[60]    1996 WL 494177 (Del. Super. Apr. 22, 1996).

[61]    *Id.* at *1.

[62]    *Del. Exp. Shuttle*, 2002 WL 31458243, at *21.

38

advertising agency did not implicate specifically the plaintiff radio station, the court found that the remark defamed the radio station as a business because the comments maligned the leading male executive in his professional conduct, which in turn maligned the company in its business of operating a radio station.

Here, Plaintiffs alleged that the 2012 Articles and the 2014 Article defamed Perlman in his professional capacity in relation to his conduct as an officer and director of a corporation. Specifically, the 2012 Articles allege Perlman used his position as a fiduciary of OnLive to cheat employees and other stockholders out of the value of their stock, misappropriated patents, personally benefited from an assignment for the benefit of creditors, mistreated employees, mistreated game publishers such as EA and Ubisoft, and incompetently turned down offers to sell OnLive to Sony, Dell, or Adobe.[63] These allegations discredit Perlman and, perhaps, to the extent it is mentioned, Rearden as well. I do not understand Plaintiffs to allege that the 2012 Articles on their own impugn the reputation of Artemis. The 2014 Article, however, which links directly to the 2012 Articles, conceivably does discredit the way Artemis does business based on Perlman's close association with Artemis in that it suggests that similar misconduct will occur at Artemis. Thus, it is reasonably conceivable that Plaintiffs will be able to prove that the

---

[63]     Compl. ¶¶ 55-57.

defamatory statements in the 2014 Article are about Artemis in the sense that they reflect discredit on the way Artemis does business.[64]

Before considering whether the 2014 Article was defamatory as to Perlman and Rearden, I address briefly Plaintiffs' argument, as clarified at oral argument, that Artemis's claim is tied to the defamation of Perlman through the republication of the 2012 Articles in connection with the 2014 Article. As discussed in greater detail below, republication is a legal term of art providing a specific exception to the single publication rule. Here, as discussed above, I construe Plaintiffs' argument to be that the 2014 Article defamed and irreparably harmed Artemis based on the context of the article, the content of the 2012 Articles referenced through the hyperlink, and the discredit arising from Vox's effort to extend the defamatory allegations against Perlman to Artemis.[65]

---

[64] Defendant's reliance on *Williams v. Howe*, 2004 WL 2828058 (Del. Super. May 3, 2004), for the proposition that Artemis cannot state a claim because the 2012 Articles did not mention it is misplaced. In *Williams*, the court rejected the plaintiff's defamation claim because she failed to establish proof of understanding by a third party that the communication referred to her in any way, *id.* at \*4, whereas here, it is reasonably conceivable that a third party would understand that the statements at issue in 2014, including the hyperlinks to the 2012 Articles, were about Artemis. In this respect, my conclusion that Artemis adequately states a claim for harm arising from allegedly false and defamatory remarks about Perlman is limited to the well-pled facts in the Complaint and the reasons stated herein and is not meant to imply that every company associated with Perlman has similar claims.

[65] In contrast to plaintiffs who rely on republication to restart an expired statute of limitations, Artemis's claims focus on the 2014 Article and are all timely.

40

### 3. Perlman and Rearden

Under California law, the single-publication rule is codified as follows: "No person shall have more than one cause of action for damages for libel . . . founded upon any single publication . . . , such as any one issue of a newspaper or book or magazine . . . . Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions."[66] "Notwithstanding the single-publication rule, a *new edition* or new *issue* of a newspaper or book still constitutes a new publication, giving rise to a new and separate cause of action and a new accrual date for the purpose of the statute of limitations."[67] Thus, under California law, Perlman and Rearden have a separate cause of action if the 2014 Article republished the 2012 Articles.

### a. Republication

In California, "[t]he [single-publication rule] restricts to a single cause of action all damages founded upon a single publication. A single publication is distinguished from a republication. If a defendant republishes material, the protection under the [single-publication rule] does not apply."[68] "The single publication rule applies to Internet

---

[66] CAL. CIV. CODE, § 3425.3.

[67] *Shively*, 31 Cal. 4th 1230, 1246 n.7, 7 Cal. Rptr. 3d 576, 80 P.3d 676, 684 n.7 (Cal. 2003).

[68] *Christoff v. Nestle USA, Inc.*, 152 Cal. App. 4th 1439, 62 Cal. Rptr. 3d 122, 136-37 (Cal. Ct. App. 2007), *aff'd in part, rev'd in part*, 47 Cal. 4th 468, 213 P.3d 132 (Cal. 2009).

publication regardless of how many people actually see it."[69]  California appears to consider the following factors in determining whether a republication occurred: (1) whether the original publication was modified; and (2) whether the republication was directed to a new, different audience.[70]  As applied to Internet publications, "under California law, a statement on a website is not republished unless the statement itself is substantively altered or added to, or the website is directed to a new audience."[71]

### b.     Hyperlink

As an initial matter, the hyperlink alone does not resolve whether the 2014 Article republished the 2012 Articles.  In 2007, a California court found "no authority holding that providing links to statements already published on the Web, without more, republishes those statements.  Rather, the court finds that such linking is more reasonably akin to the publication of additional copies of the same edition of a book, which is a situation that does not trigger the republication rule."[72]  Several other courts have concluded that a hyperlink, alone, does not constitute a republication:

> [C]ourts addressing the doctrine in the context of Internet publications generally distinguish between linking, adding unrelated content, or making technical changes to an already

---

[69]     *Kinney v. Barnes*, 2014 WL 2811832, at \*6 (Cal. Ct. App. June 23, 2014) (quoting *Cole v. Patricia A. Meyer & Assocs., APC*, 206 Cal. App. 4th 1095, 1121 n.8, 142 Cal. Rptr. 3d 646, 667 n.8 (Cal. Ct. App. 2012).

[70]     *Christoff*, 152 Cal. App. 4th 1439, 62 Cal. Rptr. 3d at 139.

[71]     *Yeager v. Bowlin*, 693 F.3d 1076, 1082 (9th Cir. 2012).

[72]     *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, 2007 WL 935703, at \*7 (S.D. Cal. Mar. 7, 2007).

42

published website (which they hold is not republication), and adding substantive material related to the allegedly defamatory material to an already published website (which they hold is republication).[73]

Only one California case addresses hyperlinks directly, and it does so only summarily.[74] Two other cases, *Salyer v. Southern Poverty Law Center, Inc.*[75] and *In re Philadelphia Newspapers, LLC*,[76] provide more useful guidance. In *Salyer*, the plaintiff argued that when the defendant published an article on a new section of its website in 2008 linking back to an allegedly defamatory 2006 article, the 2008 article republished the 2006 article because the purpose of the hyperlink was to entice new readers to click on the link and be directed to the article.[77] The plaintiff in *Salyer*, however, did not contend that the new article, which itself made no specific mention of the plaintiff, was defamatory, and the court observed that "it would be a different case had the . . . 2008 article restated the defamatory remarks about Plaintiff. In such a case, the . . . 2008 article itself could be the basis for Plaintiff's defamation claim."[78] Thus, the court

---

[73] *In re Phila. Newspapers, LLC*, 690 F.3d 161, 174 (E.D. Pa. 2012) (citing *Davis v. Mitan*, 347 B.R. 607, 611 (W.D. Ky. 2006)).

[74] *See supra* text accompanying note 72.

[75] 701 F. Supp. 2d 912 (W.D. Ky. 2009).

[76] 690 F.3d 161 (E.D. Pa. 2012).

[77] *Salyer*, 701 F. Supp. 2d at 916.

[78] *Id*. at 916 n.5.

concluded that "the critical feature of republication is, again, that the original text of the article was changed or the contents of the article presented directly to a new audience."[79]

Similarly, the plaintiffs in *In re Philadelphia Newspapers* argued that when the defendants published an article that linked to and endorsed a previously published article containing allegedly defamatory, albeit time-barred, statements, the link and reference in the new article republished the old article.[80] There, however, the court agreed with the reasoning of cases like *Salyer* and *Sundance* that neither a hyperlink to an unchanged article, nor a mere reference, without more, is a republication.[81] Thus, the court concluded that the link and reference did not amount to the restatement or alteration of the allegedly defamatory material necessary for a republication.[82]

As these cases indicate, even the hyperlink in the 2014 Article and the reference to the 2012 Articles, taken together, may not be sufficient to amount to a republication of the defamatory content of the 2012 Articles. Here, however, Plaintiffs allege that the 2014 Article not only restated and enhanced the allegedly defamatory material, but also directed it to a new and different audience.

---

[79]    *Id.* at 916-17.

[80]    *In re Phila. Newspapers*, 690 F.3d at 165.

[81]    *Id.* at 175.

[82]    *Id.*

44

### c. Enhancement, modification, or new audience

The familiar, plaintiff-friendly standard of review on a motion to dismiss requires that I conclude Plaintiffs adequately have pled that the 2014 Article enhanced or modified the purportedly defamatory statements in the 2012 Articles. The 2012 Articles accused Perlman, as the CEO and principal shareholder of OnLive, Inc., of scheming to profit from the ABC, mistreating OnLive employees following the ABC, mishandling business transactions and potential offers to acquire OnLive, and otherwise operating and governing OnLive poorly. The Complaint asserts that the 2014 Article goes further by suggesting that Perlman not only exploited OnLive's stockholders, but also victimized its customer base.[83] Thus, given Perlman's and Rearden's close association with Artemis and the frequency with which both were mentioned in the 2012 Articles, I cannot say on a motion to dismiss that the statement in the 2014 Article, considered in context provided by the content referenced by the hyperlink, could not conceivably have gone beyond merely restating defamatory allegations, and also enhanced and modified those statements. In other words, Defendant has not shown that Plaintiffs cannot prove under any reasonably conceivable circumstances that the 2014 Article enhanced or modified the defamatory allegations first published in the 2012 Articles.

---

[83]   Compl. ¶ 71 ("Stating that OnLive was 'defunct' would immediately raise concerns about the security and accessibility of OnLive's users' personal information . . . .").

These facts are distinguishable from those of a recent California case, *Kinney v. Barnes*.[84]  There, the respondent's claims, based on appropriation of name or likeness claims subject to a two-year statute of limitations, were held to be within California's statutory single-publication rule.[85]  The appellant issued a press release profiling the respondent when the appellant first hired the respondent, but did not remove the profile from the Internet for years after the respondent was terminated.  The respondent argued that the appellant modified, and thus republished, the profile at a later date, but the court rejected this argument, concluding that the appellant's removal of the date on the profile and relocation of it to the archives section of its website were not sufficient to constitute a republication of the article.[86]  In this case, the statement at issue in the 2014 Article modified the defamatory allegations published in the 2012 Articles, but, unlike the insignificant changes alleged in *Kinney*, those at issue here arguably were both substantive and independently false and defamatory.

---

[84]     2014 WL 2811832 (Cal. App. 2d Dist. June 23, 2014).

[85]     *Id.* at *6.

[86]     *Id.* at *7. *Accord Canatella v. Van de Kamp*, 486 F.3d 1128 (9th Cir. 2007) (holding the defendant did not republish the plaintiff's disciplinary summary when he added a "verbatim copy" of the summary to a different URL within the same domain name); *Yeager v. Bowlin*, 693 F.3d 1076 (9th Cir. 2012) (holding that a statement on a website is not republished unless the statement itself is substantively altered or added to, or the website is directed to a new audience); *Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122 (9th Cir. 2006) (holding that hosting information on a website does not continuously republish the information).

I also find sufficiently persuasive to survive a motion to dismiss Plaintiffs' argument that the 2014 Article directed the defamation published in the 2012 Articles to a new audience because the Complaint alleges facts sufficient to support a reasonable inference that the 2014 Article was intended to and actually did reach a new audience. Plaintiffs allege that the analysts, investors, academic researchers, and operators interested in commercial wireless technology—*i.e.*, Artemis's pCell technology featured in the 2014 Article—are unlikely to be familiar with, much less interested in, the details of the consumer video game industry as described in the 2012 Articles. Plaintiffs also allege, and I consider it reasonable to infer, that Defendant knew an article about pCell would generate high traffic on its website because pCell had received news coverage by the New York Times, Bloomberg Television, and Wired Magazine, and intentionally directed readers to the sensationalistic August 28 Article by including a hyperlink in the 2014 Article's very first sentence, which Plaintiffs allege is itself false and defamatory.[87]

The earliest and leading case on Internet republication, upon which California courts consistently rely, supports this conclusion.[88] In *Firth v. State*, the defendant issued a government report, which was critical of the plaintiff's managerial style and completion

---

[87] Compl. ¶ 106.

[88] *Firth v. State*, 98 N.Y.2d 365 (N.Y. 2002). "*Firth* has been cited with approval in two opinions of the California Courts of Appeal." *Yeager*, 693 F.3d at 1083 (citing *Traditional Cat Ass'n, Inc. v. Gilbreath*, 118 Cal. App. 4th 392, 402-04, 13 Cal. Rptr. 3d 353, 361-62 (Cal. Ct. App. 2004) (quoting extensively *Firth*'s holding that the single-publication rule applies to the Internet), and *Christoff*, 152 Cal. App. 4th 1439, 62 Cal. Rptr. 3d at 138 (citing *Firth* for its statement in dicta that "modification to a Web site does not constitute a republication")).

of work responsibilities.  Another state agency then summarized the report on its Internet site and provided a hyperlink to the full text of the report.[89]  The court rejected the plaintiff's first argument that each new "hit" or viewing of the report should be considered a new publication that retriggers the statute of limitations.[90]  The court also rejected the plaintiff's alternative argument that the defendant should be deemed to have republished the report when it later added an unrelated report on the same Internet site, but that discussion is relevant here.  Although analyzing the modification issue, the court focused its discussion on the new audience issue, stating: "The justification for this [republication] exception to the single publication rule is that the subsequent publication is intended to and actually reaches a new audience."[91]  The court further reasoned that "the republication exception has no application at all to the addition of unrelated material on a Web site, for it is not reasonably inferable that the addition was made either with the intent or the result of communicating the earlier and separate defamatory information to a new audience."[92]

By contrast, taking the well-pled allegations in the Complaint as true and drawing all reasonable inferences in favor of Plaintiffs, I conclude that it is reasonably inferable: (1) that the statement at issue in the 2014 Article modified and enhanced the earlier and

---

[89]    *Firth*, 98 N.Y.2d at 367.

[90]    *Id.* at 369.

[91]    *Id.* at 371 (citing *Rinaldi v. Viking Penguin*, 52 N.Y.2d 422, 435 (N.Y. 1981), and RESTATEMENT (SECOND) OF TORTS § 577A, cmt. d).

[92]    *Id.*

separate defamatory information referenced by the hyperlink; and (2) that Defendant intended to communicate that and the prior statements to a new audience.

Therefore, I conclude it is reasonably conceivable that Plaintiffs could prove the 2014 Article republished the defamatory statements contained in the 2012 Articles. In so concluding, I recognize that the single publication rule applies to the online domain.[93] Nevertheless, I have determined that Defendant has failed to carry its burden on a Rule 12(b)(6) motion to dismiss of demonstrating that Plaintiffs could not prove, under any reasonably conceivable set of circumstances, that the 2014 Article enhanced, modified, or directed to a new audience the 2012 Articles. It may be that the 2014 Article did not enhance or modify the allegedly defamatory statements in the 2012 Articles or direct those statements to a new audience, but those questions will have to await further development of the record in this case.

## III.    CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the Complaint is denied.

**IT IS SO ORDERED**.

---

[93]    *See, e.g.*, *Clark v. Viacom Int'l, Inc.*, --- Fed. Appx. ----, 2015 WL 4098320, at *7 (6th Cir. July 8, 2015).